**William B. WESSON, Petitioner,**

**v.**

**Dorothy GILLESPIE, Respondent.**

**No. A–9855.**

Supreme Court of Texas.

Oct. 7, 1964.

Rehearing Denied Nov. 4, 1964.

Ewing Clagett, Fillmore, Schaeffer & Fillmore, Wichita Falls, for petitioner.

Mock, Banner & McIntosh, Wichita Falls, for respondent.

GREENHILL, Justice.

This is a slip and fall case. The plaintiff, Mrs. Dorothy Gillespie, tripped over a threshold at night going out of the dimly lighted 8-Ball Lounge in Wichita Falls. She was a regular customer and had been in and out of its door and over the threshold at least 500 times. Trial was to a jury which found that the defendant negligently maintained the threshold and that this was a proximate cause of plaintiff's injury; that defendant did not fail to properly light the threshold; that defendant failed to provide a handrail, but that this was not a proximate cause; and that plaintiff did not fail to keep a proper lookout. The trial court disregarded the jury's answers to those issues which (1) found that defendant negligently maintained the threshold and that this was a proximate cause, and (2) which found that plaintiff kept a proper lookout. That court found that there was no evidence to support the jury's answers to these issues. Judgment was entered for the defendant. The Court of Civil Appeals at Fort Worth reversed. It rendered judgment for the plaintiff for the $2,900 which were found by the jury to

have been the damages suffered by the plaintiff. 370 S.W.2d 918.

Since this is a "no evidence" case and one in which it is asserted that plaintiff should be charged with knowledge of the conditions, the danger, and appreciation of the danger, the evidence must be rather fully developed.

We shall first discuss the evidence regarding the threshold itself. The jury found that it was maintained in a negligent condition. The trial court disregarded the finding as having no support in the evidence.

The 8-Ball Lounge, a beer tavern, had been operated by the defendant Wesson for about 11 or 12 years. It had been built in 1950, and no changes had been made in its one entrance. The front steps and the concrete threshold were just as they had always been. There was no evidence that there had been any change in the lighting. There were two steps up to the door which closed against the threshold. The entrance is level except for the threshold. There is a concrete strip at the door. It is level on both sides but rises gradually or is beveled to a small point in the center.

The defendant operator testified that the threshold was 3½″ to 4″ wide and extended across the entrance. Plaintiff's witness Denver Sharp, companion of the plaintiff who was in the lounge with her, agreed with that estimate. He considered this to be narrower than other thresholds by ½″ to 1″. He did not purport to be an expert witness. Pictures in evidence show the entire concrete strip, with a tape measure laid across it, was about 8″ wide. The portion which slants up from the inside floor to a point and then levels out is shown to be approximately 4″ wide. The defendant testified that it is ¾″ thick (or high) and beveled on each edge. Sharp said it was 1″ to 1½″ high. He regarded this as too high and said it did not slope as much as what he considered to be the usual threshold. The pictures in evidence with

yardsticks placed alongside the threshold show it to be between ¾″ and 1″ in elevation. They also show that the concrete strip, including the threshold, is so situated that a person leaving the tavern would ordinarily step on it before stepping down to the outside step. The floor inside the threshold is level and covered with asphalt tile. There is no inside step up or down into the tavern. The only uneven place is the threshold itself.

The defendant testified that in the years he had operated the 8-Ball, no one [to his knowledge] had ever tripped over the threshold before. Between 80 and 100 people came in the 8-Ball every day. He had never heard of anyone tripping or falling, and no such accident had ever been reported to him.

The plaintiff's witness Denver Sharp, who had been with Dorothy Gillespie in the 8-Ball the night she was injured, testified that the threshold was just a rise or hump in the floor; that the hump in the threshold was too high. But there was no evidence that he had ever tripped over it, and he usually went to the 8-Ball every night.

Essie Johnson had been a waitress at the 8-Ball some six months when the plaintiff fell. She had never heard of anyone tripping over the doorway, going in or out. She had repeatedly used the door and had never stumbled.

A former employee, Joyce Crane, said that she had seen six or seven customers trip over the threshold and that she had tripped on it once herself. But there was no evidence that she had reported any of these instances to the defendant Wesson.

The plaintiff Dorothy Gillespie had been in and out of the door two to five times a week for four or five years, and she had never stumbled or tripped over the threshold before.

George Davis, the city building inspector, had been asked to inspect the 8-Ball. He did so and did not see anything about the

·door that should be changed or corrected. He did not see anything wrong with it. As far as he knew, the threshold was all right, and there was not a thing wrong with it. The purpose of the threshold was to keep water [rain] out of the building; and his opinion was that the threshold sloped up gradually. On cross-examination, he conceded that as a building inspector, he was mainly concerned with the general structure and safety of the building. He was concerned with the steps but did not pay too much attention to the threshold. He also conceded that an impediment ¾" high at the entrance to a dark doorway would pose a hazard for people.

We regard the above evidence as being very slight evidence, if any, of negligence in the maintenance of the threshold. The defendant testified it had been repeatedly used for 11 or 12 years without a slip or fall. The plaintiff had safely used it over 500 times. As an ordinary proposition [assuming proper lighting] the building inspector found no fault with it. The waitress who knew of six or seven people, including herself, who had tripped over it did not testify that she notified the defendant of the incidents.

Nevertheless, we shall assume that there was some evidence to support the jury's finding and turn to the question of whether the plaintiff was charged with knowledge of the condition, the danger, and appreciation of the danger. The legal problems in this connection are discussed at length in Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368, 369 (Tex.1963); McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954); and Houston National Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374 (1948); and they will not be repeated here except as particularly applicable.

The physical facts as to the threshold have been set out above, but the question of the lighting needs to be developed before discussing the "no duty" cases set out in the Halepeska opinion. It is assumed that the ·condition of the threshold would have been open and obvious to Mrs. Gillespie after 500 exposures to it if she had repeatedly crossed it in the daylight, and that she would be charged in law with knowledge and appreciation of the danger. Marshall v. San Jacinto Building, Inc., 67 S.W.2d 372 (Tex.Civ. App.1933, writ refused); Hausman Packing Co. v. Badwey, 147 S.W.2d 856 (Tex. Civ.App.1941, writ refused). Her testimony was that she got off work about 8:30 p. m. and frequently went to the 8-Ball for the evening. There is no testimony that she never went to the 8-Ball in the daytime, nor is there testimony that she did.

There was little illumination inside the 8-Ball. The tavern was 20 feet by 30 feet in size. The central light was an illuminated Schlitz beer advertisement, which a waitress described as "big and round like a globe." The globe had a clear glass bottom, and it gave off some light. There was a rather dim blue neon sign over the bar, some 30 feet from the front door, and an electric clock surrounded a neon light. There was light from the "juke boxes" bright enough to see the records and the lists of records to choose from. There were lights in the cigarette-vending machines. Each booth had an individual phonograph record-selecting device, and each such device had a small light in it.

The plaintiff's witness Denver Sharp testified that it was relatively dark inside; that it was not brightly lighted. The plaintiff's witness Joyce Crane, a former 8-Ball waitress, said it was very dark in the 8-Ball. The defendant Wesson admitted that it was a little shady inside, but "you could see just as well as you need to." The plaintiff Dorothy Gillespie testified that you could not read inside the 8-Ball unless you put the reading material up against one of the juke boxes. She conceded that nobody went to the 8-Ball to read.

Outside of the 8-Ball there were many lights. Directly over the door and some 18" above it was an open white 60-watt bulb

which was burning. It stood out from the building "quite a way." There is a dispute in the testimony as to whether the light from that light bulb illuminated the threshold beneath it when the door was opened. The defendant said it did. The plaintiff did not remember the outside light: "I didn't pay much attention to it." Plaintiff's witness Denver Sharp at first testified that the light did not shine on the threshold, but on cross-examination he said he couldn't say; that he just did not notice closely. The next *night* after the accident, he had gone back to the 8-Ball and had looked at the threshold. He had that night gotten, from observation, the approximate dimensions of the threshold. It was brought out on cross-examination that he was some six feet tall and had been able to see the threshold at night [with that light] well enough to get the approximate dimensions. He did not use a flashlight to look at it.

In addition to the 60-watt globe, there were lights "all around" outside. There was a string of neon lights, several colors, around the top of the building. There was an illuminated "8-Ball" sign; and over the door there was a "Zippo Light," an inclined pole with 15 or 20 30-watt bulbs that flashed alternately.

The jury found that the defendant did not fail to maintain that amount of illumination on the threshold in question as would have been maintained by an ordinary prudent person in the exercise of ordinary care. No objection is shown to have been made to the submission of the issue. There was no point in the plaintiff's brief in the Court of Civil Appeals attacking that finding, and there is none here.

The pertinent testimony regarding the plaintiff's knowledge of the condition and the danger, or her exposure to it may be summarized as follows: she testified that she had been in and out of the 8-Ball two or three times a week for four or five years. In answer to her own counsel's question, she said the number of times she had been in and out of it would be "an astronomical

figure." She said there was a hump at the door and that the distance down to the first step was pretty far. It was some 9" down to the first step. But she admitted that the steps were just like they had always been. Then referring to the steps or to the entrance, the following questions and answers were then stated on cross-examination:

"Q. Has it always been dangerous?

"A. Yes, sir.

"Q. And you so considered it?

"A. Yes, sir.

"Q. But you kept using it anyway?

"A. Yes, sir."

On the evening of the accident, Mrs. Gillespie got off from work about 8:30 p. m. and proceeded to the 8-Ball. She entered without difficulty. She went with Denver Sharp, who worked where she did, and there they joined Sergeant Whitey Stillman. She had a "red draw" (beer with tomato juice in it). About 9:30, she left the 8-Ball [without difficulty] to meet a friend in front of another lounge. She came back into the 8-Ball about 10 p. m. and had two or three more "red draws." About 11:40 p. m. she decided to leave. She said on going out that she walked in an ordinary nonhurried manner to the front door and pulled the door open. The door opened to the inside. She said she did not stumble as she opened the door, but she tripped on the door sill or the hump on top of the threshold. She hung her heel, lost her shoe, and fell out the door onto the sidewalk, breaking her wrist. She got up without assistance and walked to her car. Sharp and Stillman later took her to a hospital.

She said she left the 8-Ball because she got bored. The men she was with would not leave; they wanted to drink some more beer. So she left by herself. Denver Sharp testified that he had called her a taxicab. The waitress Essie Johnson said

that when she went to serve "them" a drink, the plaintiff and Sergeant Stillman were having an argument, and that the plaintiff got up and rushed out of the tavern. The defendant Wesson said that the plaintiff was practically running when she left. He testified, however, that she was not noticeably intoxicated. (The jury found that she did not fail to keep a proper lookout.)

If we consider that the testimony of the plaintiff that "it had always been dangerous; that she so considered it; but she kept on using it" referred to the entrance including the threshold, then the case is simple. By this statement, she admitted that she knew of the condition, knew it was dangerous, and appreciated the particular danger. Notwithstanding this knowledge and appreciation, she continued to use the entrance. She could not then recover. McKee v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954).

■ That testimony came directly after counsel had been cross-examining the plaintiff about the steps. So plaintiff's counsel insists that it was the steps that she had always considered dangerous. But the questions were about "it" and not "they" or "them." If we treat the testimony as referring only to the steps, then we come to the question as to whether the plaintiff knew of the condition of the threshold, realized it was dangerous and appreciated the danger. No issues were submitted to the jury on these questions. The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment for the plaintiff. It did so because it considered that the burden was upon the defendant to request them, notwithstanding the fact that the burden of proof is upon the plaintiff, as part of the plaintiff's case, to negative "no duty" in the occupier-invitee situations. Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Tex.1963). The Court of Civil Appeals then considered that the defendant had waived this "de-

fense" for failure to request issues thereon, or to object to the charge given by the court because of their omission.

Our examination of the transcript shows that the defendant did request several issues including in substance the following: Was the front door area including the threshold not in a safe condition; was it not in a reasonably safe condition; did the entrance not present a dangerous condition; was the condition of the sill across the threshold open and obvious; was it open and obvious to an ordinary prudent person; did the entrance not involve an unreasonable risk of harm to the plaintiff's safety; did the plaintiff know of the condition; should she have known of it in the exercise of ordinary care, and was this a proximate cause. All of these requested special issues were refused. There were no requested issues on knowledge of the danger or appreciation of the danger. Upon whom was it incumbent to request these issues? Assuming, without deciding, that the burden was on the defendant to request the "no duty" issues, it could be well contended that he did request a part of the cluster of issues. He requested issues as to whether there was a dangerous condition and whether plaintiff knew of the condition. Having requested a part of the cluster of issues, was it the duty of the court to submit the requested issues, shifting the burden to the plaintiff to object to the incomplete submission? In view of our disposition of the case, however, it is unnecessary for use to decide these difficult special issue matters on the submission of a "no duty" case.

■ The holdings of this Court are that ordinarily a plaintiff-invitee cannot recover if he knows of the condition, realizes the danger, and appreciates the danger, or is charged in law with such knowledge, realization, and appreciation. Halepeska v. Callihan Interests, Inc., supra; McKee v. Patterson, supra; Houston Natl. Bank v. Adair, 146 Tex. 387, 207 S.W.2d 374 (1948).

In the Adair case, this Court assumed that the dangerous condition was not open and obvious and that the stairs upon which Mrs. Adair fell were not properly lighted. Nevertheless, Mrs. Adair had been upon the stairs many times, perhaps including many times when the light was good. She denied knowledge of the dangerous condition or the danger. But because of her many exposures to the condition, this Court charged her with knowledge, realization and appreciation of the danger.

In a later case, this Court said in Triangle Motors v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953), that it was not the philosophy of Adair that one trip through a hall of dangers which are not open and obvious would relieve the owner of his duty to eliminate the danger or to warn. In the case at bar, however, the plaintiff had been, by her own admission, across the same threshold "an astronomical number of times"; at least 500. She tripped on her fourth exposure that same night, going out of (not coming into) the tavern. The jury found that the owner did not fail to properly illuminate the threshold. The condition was static and part of the permanent construction. It was so situated that unquestionably she had stepped on it, or deliberately stepped over it, on most of her departures from the 8-Ball. In any event, while as we said in Triangle Motors that one exposure to a danger may not relieve the owner, there must be some limit to the number of times when a person exposed to a dangerous condition will be charged with knowledge of the condition and knowledge and appreciation of the danger. If it were only a few times, we would have a different problem. But two to five exposures a week for four or five years under the same conditions, in our opinion, must fall within the area of charged knowledge and appreciation. We hold that it does.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.