**Harold ELLIS, a Minor by Next Friend, et al., Petitioners,**

**v.**

**John I. MOORE and H. R. Wardlaw, d/b/a Red Town Farm, et al., Respondents.**

**No. A–10582.**

Supreme Court of Texas.

March 23, 1966.

Rehearing Denied May 11, 1966.

B. R. Reeves, John B. McDonald, Palestine, Helm, Jones & Pletcher, Houston, for petitioners.

Ramey, Brelsford, Hull & Flock, and Donald Carroll, Tyler, for respondents.

GREENHILL, Justice.

This is a suit for personal injuries arising out of an accident in which a tractor furnished by defendants turned over on Harold Ellis and seriously disfigured him. Trial was to a jury, resulting in a judgment on the jury verdict for the plaintiffs for $126,000. The Court of Civil Appeals at Tyler held that as a matter of law the defendants had breached no duty to Harold. It reversed the judgment of the trial court and rendered a judgment that plaintiffs take nothing. 385 S.W.2d 261.

The suit was instituted by Harold Ellis through his next friend and by Harold's father, A. G. Ellis. The defendants were John I. Moore and H. R. Wardlaw who did business as Red Town Farm, and the foreman of Red Town Farm, L. E. McCrary. Moore and Wardlaw lived in West Texas, and the farm was in East Texas. They operated the farm through McCrary. Red Town Farm consisted of some 6400 acres in pasture and cultivation. Part of the land was leased to tenants upon a percentage basis of the crops produced. One such tenant was a Mr. Harper. He in turn employed A. G. Ellis. Ellis, with his family, lived in a house on the leased portion of the land. Part of the tenant's duties under the lease contract was to keep the land free of Johnson grass. During a summer recess from school, Harold Ellis, a 16-year-old boy, was employed by Harper for 50 cents per hour to clear certain areas of Johnson grass by the use of a tractor which pulled disks behind it.

The testimony established that it was the custom of the various tenants to use the farm machinery of Red Town Farm. Similarly, the employees of Red Town Farm were privileged to use the machinery belonging to the tenants. Moreover the tractor in question, as stated, was used to plow up Johnson grass on the farm, a service which inured also to the benefit of Red Town Farm. The bailment in question therefore was one for the mutual benefit of the bailor and the bailee.

On June 19, 1962, the day before the accident, Harper hired Harold to "disk some turn rows." The particular land was not in cultivation but adjoined cotton rows. It was part of the land leased by Harper. Early in the morning of that day, Harper and Harold went to the Red Town Farm headquarters to get one of Red Town's tractors and the disks to be dragged behind the tractor. Neither the foreman McCrary nor anyone else representing Red Town Farm was present when the equipment was withdrawn. It nevertheless was taken with Red Town's consent as set out above. McCrary said he had nothing to do with the tenants' land except to see that they did not grow up in Johnson grass.

The tractor had at its rear two hydraulic lifts. One we shall designate as the cylinder lift. It was designed to lift the disks out of the ground when they became clogged with dirt so that the disks could be freed of the mud or dirt. The cylinder lift was so designed that when it was raised, the weight of the disks and the mud or dirt on them would be distributed onto the wheels of the disking device. With the use of the device, all of the tractor's wheels remained firmly on the ground. This particular lift, however, was defective and could not be used because its handle was missing. McCrary had known for some time that the cylinder lift was not working.

The tractor also had another lift, separate and apart from the cylinder lift, which we shall call a three-point hitch. It could lift a drawbar at the rear of the tractor which lifted the disks out of the mud or dirt so that the disks could clean

themselves, or so that the dirt could be knocked off them.

On June 19, then, Harold got on the tractor and proceeded to disk the land. He testified that he had had very little experience with tractors. He had driven one a few times before and had generally been told how by his father. No one including McCrary had given him any detailed safety instructions.

The soil was flat, river-bottom land. There had been rain, and it was "pretty wet." McCrary described it as "gumbo-type soil." As Harold pulled the disks, the soil attached itself to the disks and "balled up." Harold attempted to use the cylinder lift, but it would not work.

About 10 a. m that morning both Harper and McCrary, at the same time, came to the place where Harold was working. They observed the problem Harold was having. Harold testified that McCrary attempted to repair the cylinder lift. McCrary denied this. In any event, McCrary told Harold that the cylinder lift would not work, and to do the best he could. He offered no further directions or suggestions as to how the mud could be safely removed from the disks. McCrary upon the trial testified that the proper way to do it was to disconnect the disks, bring the tractor back behind them, and then pull the disks backward, away from the mud. But he did not tell Harold this.

There is no evidence that Harold told McCrary that the front wheels of the tractor had come off the ground when he used the three-point hitch to clean the disks. McCrary and another of defendants' witnesses testified that if the front end of the tractor comes off the ground or "rears up," the proper thing to do is to disengage the clutch and lower the throttle. McCrary did not so inform Harold.

Two farmers called by defendants testified that the front end of the tractor was light, and if the tractor got overloaded at the rear (as this one did), the front end would come off the ground. McCrary testified that the way to go about upsetting the tractor was to put excessive weight on the rear of it or overload it. If the back is overloaded, he testified that "it will come up and over."

According to Harold's testimony, as he was disking the land on June 19, it became necessary for him to lift the disks some ten times. On two of the occasions, the front of the tractor came off the ground; and he got the front to descend by releasing the clutch. He said that it did not worry him when the front wheels came off the ground because it had never occurred to him that the tractor might turn over. He had never heard of a tractor "upsetting on a fellow before." When he went home that evening, he did not mention the fact that the front wheels had come off the ground.

Harold again began work on June 20. On one occasion that morning, the tractor "reared up" on him without incident as he cleaned the disks. On the second occasion about 11:30 a. m., however, as he was looking backward at the balled-up disks, he raised the three-point hitch to clean them. He testified that he was then in a narrow ditch. The front came off the ground, and the tractor turned over on him. Harold testified that the accident happened so quickly that he could not manipulate the clutch or throttle. He was pinned under the tractor and knocked unconscious. Hot crankcase oil went over his face and body causing, among other things, serious disfigurement to his face.

McCrary testified that he did not know that Harold was using the three-point hitch, though he knew that was one of two ways of lifting the disks, the other way being out of repair. He said Harold did not tell him about the tractor "rearing up" on him. He testified that the proper function of the three-point hitch was to lift the disks when the tractor was being moved from one place to another.

The jury made extensive findings. Grouped here for the sake of convenience, they were:

1. McCrary permitted Harold to use the tractor. In so doing, he was acting within the scope of his employment. He permitted Harold to use the tractor when the cylinder lift was in a known defective condition, which constituted negligence and a proximate cause of Harold's injury.

2. The defendants knew, or should have known in the exercise of ordinary care, that the defective condition of the cylinder lift could in reasonable probability cause the tractor to upset.

3. The failure to so warn Harold was negligence and a proximate cause.

4. The defendants failed to give Harold proper instructions. This was negligence and a proximate cause.

5. Harold did not permit the disks to become overloaded. [The jury did not answer the supporting negligence or proximate cause issues.]

6. Harold did not permit an excessive amount of dirt to build up in front of the disk. [Again, the supporting negligence and proximate cause issues were not answered.]

7. Harold's attempting to raise the disk while the tractor was in motion was not negligence.

8. Harold did not fail to keep a proper lookout.

9. His failure to engage the clutch was not negligence, and his failure to close the throttle was not negligence.

10. It was not an unavoidable accident.

11. Harold's father was acquitted of negligent conduct.

Then there were a number of issues which could be placed under the general heading of assumed risk:

12. The use of the tractor for disking operations under the circumstances created a danger to Harold; and the condition of the tractor was such as to [also] create a danger to him.

13. The condition of the tractor was not as open and obvious to Harold as it was to McCrary.

14. Harold knew that the cylinder lift was not in operating condition, but

15. He did not fully realize and appreciate the nature and extent of such danger.[1]

16. Harold did not voluntarily expose himself to the danger.

It is clear from the special issues set out that the defendants were found to have been negligent in a number of respects; and that although many issues of contributory negligence were given, the jury acquitted Harold of contributory negligence. The Court of Civil Appeals reversed the judgment in plaintiff's favor, however, under principles of assumed risk: that the defendants owed the plaintiff no duty. Since they owed Harold no duty, they breached no duty to him, and hence were not liable.

■ This Court in Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (1963), recognized that the assumed risk doctrine is a relatively harsh one, and the Court indicated that it felt required to keep it within justifiable limits. 371 S.W.2d 368 at 380. In our opinion, the Court of Civil Appeals in this case erroneously extended the doctrine. Its holding is that it is enough to bar the plaintiff from recovery if the plaintiff [Harold] knew of the defective condition. Its holding, in substance, is that since Har-

---

1. The jury also answered "we do not" to an issue inquiring whether Harold *should have* realized and appreciated the danger. This case was submitted before the publication of the *Halepeska* opinion, infra.

old knew that the tractor was in a defective condition (the cylinder lift would not function), he could not recover. It was the clear holding of this Court in McKee v. Patterson, 153 Tex. 517, 217 S.W.2d 391 (1954), in Dee v. Parish, 160 Tex. 171, 327 S.W.2d 449 (1959), as well as in the *Halepeska* case that the knowledge of the defect is not enough. There must be knowledge of the danger involved and the appreciation of the danger. This Court pointed out in Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953), that there must be knowledge and appreciation of the particular danger involved so that the plaintiff proceeds to encounter the risk as the result of an intelligent choice. The jury found that Harold did not fully realize and appreciate the danger. The danger was not one which was so open and obvious that we would charge Harold with knowledge and appreciation of it.

Where the assumed risk doctrines of "no duty" or *volenti* are invoked, the duty of the defendant is to exercise ordinary care to make reasonably safe or to warn. There are jury findings that defendants did not exercise ordinary care to make safe. The function of the warning is to give the plaintiff knowledge and an opportunity to appreciate the danger. He then can decide whether to confront the danger. The jury found no warning or instruction was given here.

However, the defendants argue, in effect, that there is no evidence of foreseeability to support the negligence or proximate cause issues found against them upon which their duty rests. While they were under a duty to exercise ordinary care against dangers of which they knew, or dangers of which they should have known, it is contended that there is no evidence to show that they should have, in the exercise of ordinary care, foreseen the danger which caused the injury to Harold. They point out that the three-point hitch used by Harold was in good order; that it was the use [or misuse] of *that* lift which caused the injury, and not the defective cylinder lift which Harold knew to be defective and which he was not using. This boils down to an assertion that as a matter of law, the defendants could not foresee that Harold would attempt to use the three-point hitch to lift the disks; and that even if he did, he would fail to release the clutch if the front end came off the ground. We disagree, and hold that there was evidence to raise issues for the jury.

McCrary testified that there were only two ways to remove the mud or dirt from the disks. One was by the cylinder lift which was not working and the other was the three-point hitch.[2]

McCrary knew that if the three-point hitch were used, the weight would be placed on the back of the tractor. The front end of the tractor was light. While he testified that the tractor would not upset unless it became overbalanced, he testified that the best way to upset the tractor would be to overload the back of it. Under those conditions, "it will come up and over." On June 19, McCrary came upon Harold while Harold was having his problem with the disks and the balling-up of the mud. He knew the cylinder lift was not working. He knew Harold would continue to try to do the work; in fact he told Harold to go ahead and do the best he could. He knew Harold's approximate age because Harold had been in his house and had associated with his children. He referred to him as

2. McCrary's testimony was as follows:
"Q. And you also knew at that time there were only two ways to remove the disk from the earth. One was by the use that we've already talked about.
"A. Yes.

"Q. Which was not in proper working order, right?
"A. Yes.
"Q. The other was, to use the, I believe counsel for the defense has called it a three-point hitch.
"A. Yes."

"a boy," and guessed his age at 17. He knew he was still in public school. McCrary's attitude, according to his testimony, was that he did not have to tell Harold anything because Harold was not working for him or on his [Red Town's] land. We cannot say as a matter of law that he could not foresee that Harold would attempt to use the other method of raising the disks,—the use of the three-point hitch. And because of Harold's youth, inexperience, and lack of instructions, we cannot say as a matter of law that McCrary could not foresee that if Harold did use the three-point hitch, he might not skillfully apply the clutch and throttle when the tractor's front wheels left the ground.

■ The respondents, defendants below, assert that the bailment was gratuitous and that it is wrong to here use the same tests as in an assumed risk ("no duty" and *volenti*) case involving an occupier and an invitee, as those rules were stated in McKee v. Patterson, *Halepeska,* and similar cases. We have already indicated our disagreement with the assertion that there was a gratuitous bailment. We regard it as one for the mutual benefit of bailor and bailee. This Court in Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99 (1953), judged the duty of the bailor along the occupier-invitee lines. This Court there said, "The duty of the supplier is likened to that of an occupier of land to an invitee." 262 S.W.2d at 102. The "should have known" test was approved as to the supplier. While that was a bailment-for-hire case rather than one for mutual benefit, we think the same rules should be applicable. Generally speaking, cases should be determined on the basis of negligence, and contributory negligence. Our disposition is not to extend the doctrine of assumed risk so as to excuse negligent conduct on the part of the defendant. As above indicated, it is a harsh doctrine, and we are not disposed to relax the rules set down for the escape from liability under it. Our holding is that with a bailment for the mutual benefit of the parties, if the supplier

seeks to avoid liability under the doctrine of assumed risk (no duty), the rules set down in McKee v. Patterson, Dee v. Parish, and *Halepeska* are applicable.

■ We are of the opinion that the Court of Civil Appeals erred in reversing the judgment of the trial court and rendering judgment for the respondents, defendants below. The defendants below were appellants in the Court of Civil Appeals. In that court they had 79 points of error. The Court of Civil Appeals expressly stated in its opinion that it reached only the first 9 points and found it unnecessary to pass upon the others. Included within this mass of points not passed upon are assignments that most of the answers to the special issues were against the great weight and preponderance of the evidence and were supported by insufficient evidence. There is also a point that the amount of damages awarded was excessive. The judgment of the Court of Civil Appeals is therefore reversed, and the cause is remanded to that court so that it may pass upon the points of error which it did not consider.

GRIFFIN, Justice (dissenting).

I cannot agree with the majority opinion upholding liability of respondents herein for furnishing a tractor to plaintiff Harold Ellis without a properly-working cylinder lift. The record does not show such a lift is, or ought to be, standard equipment on a farm tractor. The record does not show that Mr. McCrary, respondents' foreman, had the slightest knowledge that Harold Ellis was using this tractor at the time of the injury, so as to cause the front wheels to raise off the ground. Harold grew up on a farm and around tractors and had driven tractors prior to this time, and he had pulled discs with tractors prior to this occasion. Tractors, when properly used or operated, do not "rear up" and turn over. McCrary had no reason to anticipate that this tractor would "rear up" or turn over.

There is no question but that Harold knew the cylinder disc on this tractor was

not working as early as about 10:00 a. m. on the morning he began to use the tractor, and being the day prior to his being injured. Harold did not tell either Mr. McCrary, Mr. Harper, his employer, or anyone else that the tractor was "rearing up" as he operated it. This case stands in the same position as if the tractor had never been equipped with a cylinder lift.

The rule of liability of a furnisher of a chattel to another is stated in the Restatement of the Law of Torts, Vol. 2, 2d Ed., 1965, as follows:

"§ 388. Chattel Known to be Dangerous for Intended use

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

"(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

Under comment (f) to § 388, it is said that liability of a supplier of a chattel exists "if, but only if, there also exists the other conditions necessary to liability."

Under the comment to clause (b) of § 388, the Restatement says:

"One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character *in so far as*

*it is known to him,* or of facts which to his knowledge make it likely to be dangerous, *if, but only if,* he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition which a mere casual looking over will disclose, unless the circumstances under which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made. * * *" (emphasis added.)

See also: Lackey v. Perry, 366 S.W.2d 91, 94–95 (Tex.Civ.App., 1963) n. w. h.; Nesmith v. Magnolia Petroleum Co., 82 S.W.2d 721 (Tex.Civ.App., 1935) n. w. h.; 131 A.L.R. 845, 853; 8 Am.Jur.2d § 154, p. 1047; 8 C.J.S. Bailments § 40, p. 479.

The record shows without dispute that prior to selecting this particular tractor from the Red Town machinery park, Mr. Harper—the bailee— knew that the cylinder lift would not work. Harold Ellis discovered this fact prior to 10:00 o'clock on the morning of June 19, 1962—the day the tractor was borrowed. On June 19th and prior to the occasion when Harold was injured about 11:30 a. m. on June 20, 1962, the disc plow on nine or ten occasions had "balled up" or pushed up huge quantities of soil immediately in front of the disc so that the plow no longer was functioning and would not cut into the ground. Harold Ellis testified that on such occasions he would use the drawbar lift—the only lift that was working—and raise the tractor drawbar and keep driving until the disc had passed over the pile of soil in front of the disc. Then he would release the drawbar lift and the plow would again take the soil and start cutting as it was supposed to do. He further testified that on three of these occasions and prior to the time of his injury, when he applied the drawbar lift and was driving over the pile of soil, the front wheels of the tractor just seemed to float off the ground about a foot or a foot and a half in the air until the disc had passed

over the pile of dirt and then the wheels would settle down. *He testified that he would drive five, six or seven yards with the front wheels in the air. As far as this record shows, these facts were not known to Mr. McCrary and Harold did not tell him about the front wheels leaving the ground when he drove the tractor over the piles of dirt.*

The record also shows without dispute that at the time the tractor was taken by Mr. Harper, Mr. McCrary was not present and so could not have given instructions as to its use to anyone—including Harold Ellis. Mr. McCrary testified that on the morning of June 19th he did not give instructions to Harold about the fact that the cylinder lift was not operating in that the lever to the cylinder lift was broken. Harold knew this fact and therefore, under clause (b) of § 388 of the Restatement, Mr. McCrary was under no duty to tell Harold of the existence of a defect which Harold already knew to exist. Furthermore, under the comment to clause (b) quoted above, Mr. McCrary was only under a duty to inform Harold of a dangerous character of the tractor "in so far as it is known to him." *There is nothing in the record which establishes that McCrary was aware of the fact that Harold was operating the tractor in such a manner that the front wheels of the tractor would raise off of the ground.*

Under the rule of law quoted from § 388 of the Restatement of Torts, and the other authorities cited, I would hold that there was no liability attached to either Mr. McCrary or to Red Town as the bailor of this tractor. Mr. McCrary breached no duty owing to Harold by his failure to warn him of the existence of a condition known to Harold. Neither is there any evidence in this record to support a finding that it could reasonably have been foreseen that the use of a tractor without a cylinder lift would cause injury to one operating such a tractor. The majority opinon herein will require all farm tractors used hereafter to be equipped with properly working cylinder lift, lest the tractor overturn as the result of its improper use and operation by a farm hand.

I would affirm the judgment of the Court of Civil Appeals.

HAMILTON and POPE, JJ., join in this dissent.