**HOUSTON SPORTS ASSOCIATION, INC.,**
**Appellant,**

**v.**

**Mrs. Ella B. RUSSELL, a widow, Appellee.**

**No. 277.**

Court of Civil Appeals of Texas,
Houston (14th Dist.).

Jan. 28, 1970.

Rehearing Denied Feb. 25, 1970.

Lew W. Harpold, W. Ervin James, Hofheinz & James, Houston, for appellant.

W. James Kronzer, Brown, Kronzer, Abraham, Watkins & Steely, Houston, for appellee.

TUNKS, Chief Justice.

This is a personal injury case. The injuries were sustained by Mrs. Ella B. Russell, plaintiff in the trial court and appellee here, when she fell while going down some steps in the Harris County Domed Stadium. The Houston Sports Association occupies the Harris County Domed Stadium as lessee from Harris County. Houston Sports Association was the defendant in the trial court and is appellant. At the time of her fall Mrs. Russell was in the domed stadium as an invitee of

Houston Sports Association. The trial was to a jury and resulted in a judgment for Mrs. Russell for $42,892.25. Under the circumstances hereinafter discussed the trial court required a remittitur of $12,500. Such remittitur was duly filed. Houston Sports Association has appealed. The parties will sometimes be designated as they were in the trial court.

Soon after the domed stadium was opened, the Houston Sports Association began conducting guided tours through it. Each person taking such tour was charged $1. On October 18, 1965, Mrs. Russell, her sister and her cousin took the guided tour of the stadium. At the time Mrs. Russell was 79 years old and her sister and cousin were ladies about 70 years of age. It was the practice of the appellant to conduct special slower moving tours for elderly people and those who were physically handicapped. These ladies decided to take this slow tour.

After those intending to take the tour had entered the stadium they were assembled for preliminary instructions. They were then divided into groups, each led by a guide, and proceeded through the stadium. As they came to the various points of interest the guide would give a "spiel" calling attention to and explaining the interesting features of the stadium.

There were about 40 people in the slow moving tour of which Mrs. Russell and her relatives were members. The tour had been going for some time when it reached the area on the fifth level of the stadium where the press boxes were located. Much of the testimony given in the description of the area was given with reference to a drawing on a blackboard. The trial judge and the members of the jury were able to see the blackboard to which the witnesses referred and pointed as they described the area. The description of the area was, therefore, clearer to them than it is to this Court. It is apparent, though, that the members of the tour group approached the press boxes from one level and were re-

quired to take two steps down to reach the level on which the press boxes were. It was in taking the first of these two steps down that Mrs. Russell fell. There was no handrail for the use of those descending the steps. The liability issues submitted to the jury and the answers thereto were as follows:

## "SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that the depth of the step in question created a more than ordinary risk of harm to Mrs. Russell in using the step at the time and on the occasion in question?

"By the term 'more than ordinary risk of harm' is meant such risk as would not have been allowed to exist by reasonably prudent persons in the exercise of ordinary care under the same or similar circumstances.

"To which the jury answered 'We do'.

"If you have answered Special Issue No. 1 'We do', and only in that event, then answer the following:

## "SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that such risk of harm, if any, was a proximate cause of Mrs. Ella B. Russell's fall?

"To which the jury answered 'We do'.

"If you have answered Special Issue No. 1 'We do', and only in that event, then answer the following:

## "SPECIAL ISSUE NO. 3

"Do you find from a preponderance of the evidence that at the time that Mrs. Russell took her first step down she did not actually know that she was confronted with a condition creating a more than ordinary risk of harm?

"To which the jury answered 'She did not actually know'.

"If you have answered Special Issue No. 3 'She did actually know', and only in that event, then answer the following:

## "SPECIAL ISSUE NO. 4

"Do you find from a preponderance of the evidence that at the time Mrs. Russell took her first step down she did not actually, fully appreciate the more than ordinary risk of harm, if any, with which she was confronted?

"To which the jury gave no answer.

## "SPECIAL ISSUE NO. 5

"Do you find from a preponderance of the evidence that the failure of the Houston Sports Association to provide handrails on the occasion in question was negligence as that term is herein defined?

"To which the jury answered 'We do'.

"If you have answered Special Issue No. 5 'We do', and only in that event, then answer the following:

## "SPECIAL ISSUE NO. 6

"Do you find from a preponderance of the evidence that such failure, if any, was a proximate cause of Mrs. Russell's fall?

"To which the jury answered 'We do'.

## "SPECIAL ISSUE NO. 7

"Do you find from a preponderance of the evidence that at the time and on the occasion in question Plaintiff, Mrs. Ella B. Russell, failed to keep such a lookout as would have been kept by a person of ordinary prudence in the exercise of ordinary care under the same or similar circumstances?

"To which the jury answered 'We do not'.

"If you have answered Special Issue No. 7 'We do', and only in that event, then answer:

## "SPECIAL ISSUE NO. 8

"Do you find from a preponderance of the evidence that such failure to keep such a lookout, if you have so found, was a proximate cause of the occurrence in question?

"To which the jury gave no answer.

## "SPECIAL ISSUE NO. 9

"Do you find from a preponderance of the evidence that the accident in question was not the result of an unavoidable accident?

"By the term 'unavoidable accident,' as used in the above Special Issue, is meant an event which occurred without having been proximately caused by any negligence on the part of either party thereto.

"To which the jury answered 'It was not the result of an unavoidable accident.' "

The jury then found that the plaintiff has sustained $42,500 damage for past and future physical and mental pain and suffering and for loss of past earnings and future earning capacity. The damages sustained by way of medical expense were found, separately, to be $392.25.

■ The first question presented for determination by this Court is the question as to whether there is any probative evidence of the facts found by the jury upon the basis of which liability was imposed upon Houston Sports Association. This is the "no evidence" question of law. "In deciding that question, the appellate court must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary." Garza v. Alviar (Tex. Sup.Ct.), 395 S.W.2d 821, 823.

■ It is to be remembered that a special area of the law of torts is applicable to this case because the relationship of the plaintiff to the defendant was that of an invitee to an occupier of the premises in

question. Where an invitee seeks to recover from the occupier for injuries sustained because of a condition on the premises onto which he has been invited by the occupier, he must sustain the burden of proving that he was injured because a condition on the premises constituted an unreasonable risk of harm to him and that the occupier was under a duty to take reasonable precautions to protect him from such dangerous condition. Halepeska v. Callihan Interests, Inc. (Tex.Sup.Ct.), 371 S.W.2d 368.

The physical characteristics of the step on which Mrs. Russell fell were established fairly definitely by the evidence. The depth from the floor from which Mrs. Russell stepped to the tread of the stair onto which she was stepping was approximately 8¾ inches. The width of the tread on the step was approximately 12 inches. The area was well lighted. There was no rubbish lying about. There was no handrail. The surface was not slick, worn or broken.

Plaintiff's contention that a condition existed which constituted an unreasonable risk of harm to her, if sustained, must be sustained because the depth from the floor from which she stepped to the tread of the step onto which she was trying to step, was, under the existing circumstances, too great for the safety of her and the other invitees exposed to such condition.

An architect called as a witness by plaintiff testified to facts which showed his qualification to give expert opinion as to the proper construction of steps in public buildings. He testified that the step should be so constructed that the maximum height of the riser should be not more than 7¾ inches. He also testified that the heighth of the step on a particular public building should conform to the prevailing architectural practice as to the heighth of steps in public buildings generally. In response to questions by appellee's attorney he said:

Q. (By Mr. Ballard) "What is the purpose, Mr. Green, from an architectur-

al standpoint, for maintaining a normal or similarity in steps between different buildings, say between the courthouse building and the building over here? What is the purpose for having a similar type of steps in different buildings?"

A. "Well, it has been found that people can, I suppose, navigate these steps if they are within this certain range and that is why these rules are set up."

Q. "What range are we talking about now?"

A. "Well, this general range that I was speaking of as seven and a half to seven and three-quarter inch rise with, say, an eleven-inch tread."

Mrs. Russell testified that she did not realize the depth of the step until she had committed herself and that it was the depth of the step which caused her to fall. She said, "I stepped down and after I stepped I realized it was too deep and it threw me * * *."

In determining whether a particular condition constitutes an unreasonable risk of harm to invitees consideration should be given to the circumstances of the invitation. This case involved an invitation, for a fee, to elderly and lame people to walk through the domed stadium while observing and listening to explanation of the interesting features of the facility. The jury might reasonably have concluded that a condition which would have been reasonably safe under other circumstances was unreasonably dangerous under the circumstances of this case.

The plaintiff had the burden of proving not only that the dangerous condition existed but also that the defendant had a duty to warn or protect her from that danger. If the plaintiff knew of the dangerous condition and actually appreciated the risk of harm created by its existence then the defendant had no duty to warn or otherwise provide to protect her from it. Halepeska v. Callihan Interests,

Inc., supra. The test applied here as to the defendant's duty is subjective insofar as the plaintiff is concerned. Did she actually know of the danger in descending the steps in question and did she actually appreciate the risk involved in undertaking to descend them? Greenhill, Assumption of Risk, 16 Baylor Law Review, 111, 119. Here the jury found that Mrs. Russell did not know the risk involved. This finding is supported by the plaintiff's testimony that she did not realize that the step was too steep until after she had already committed herself to the first downward step.

■ Even though the plaintiff testified that she did not know of the danger and even though the jury, believing that testimony, found that she did not know, if the danger was sufficiently "open and obvious" she was charged with such knowledge and appreciation. That is to say, the defendant had no duty to warn or protect its invitees from a danger so open and obvious as to charge the invitees with knowledge and appreciation of it. In discussing the matter of a danger being so open and obvious as to charge an invitee with knowledge and appreciation of it, Judge Greenhill in the above cited article from 16 Baylor Law Review, at p. 118, said:

" * * * My understanding of 'open and obvious' in 'no duty' cases is expressed by the popular phrase of the comic-strip character, Li'l Anber: the defect must be one that 'any fool could plainly see.' "

■ According to some of the testimony the step in question was about an inch deeper than those of other public buildings constructed in keeping with accepted proper architectural procedure. It was an area of the stadium not regularly open to the public for sporting events. It was in an area of the stadium into which elderly and lame people were conducted on tours. It could reasonably have been foreseen that those on the tours would naturally have their interests distracted by the features of the stadium. The plaintiff had never been in the area before and, presumably, neither had other people participating in such tours. The people in the tour in approaching the step came from the upper level from which the depth of the step was less apparent than if it had been approached from the lower level. Under such circumstances it cannot be said, as a matter of law, that the danger in the unusual depth of the step was so open and obvious as to relieve the defendant of the duty of warning of the danger or otherwise protecting against it. While the step was open and obvious its dangerous depth was concealed. It is true that it was only about an inch deeper than the proper step for a public building, but according to the testimony of the architect, the maximum allowable variation from a maximum 7½ inch depth was one-quarter inch. Under the circumstances the jury's findings upon which the defendant's liability were based were supported by some evidence and were not so against the preponderance of the evidence as to be clearly wrong.

The trial court, on January 27, 1969, signed a judgment for plaintiff on the verdict. The defendant's original motion for new trial was filed on February 6, 1969. An amended motion for new trial was filed on February 21, 1969. One of the grounds assigned in the defendant's amended motion for new trial related to the misconduct of the jury in discussing and considering attorney's fees which the plaintiff would have to pay out of the money recovered by her. The amended motion was heard on February 28, 1969 at which time nine of the jurors testified with reference to the alleged misconduct. According to the recitations in an order later signed by him, the trial judge, on March 5, 1969, announced that the defendant's amended motion for new trial was granted "as per order to be entered." The trial judge's docket sheet, which was included in the transcript, contains an entry dated 3–5–69, reciting, "Defendant's Amended Motion for New Trial Granted." On

March 10, 1969, no written order granting the motion for new trial having been signed, the plaintiff filed a motion to reconsider the amended motion for new trial, and, upon such reconsideration, to grant the new trial only on condition of plaintiff's refusal to file a remittitur of $12,500. The docket sheet, on the same line as the 3-5-69 entry, and following it, contains the following entry: "3-10-69 subject to hearing on Plaintiff's Motion for Remittitur & any Applicable ruling thereon." Plaintiff's motion to reconsider was heard on March 18, 1969. On April 1st, the trial judge signed an order granting the new trial unless the plaintiff filed a remittitur of $12,500. Such remittitur was timely filed and defendant's motion for new trial thereupon overruled.

The trial judge was not required to, and did not, recite findings of fact as the basis for his ruling on the amended motion for new trial. There was testimony by some of the jurors clearly sustaining an implied finding of misconduct in the discussion of attorney's fees. The appellee seeks to sustain the court's order overruling the amended motion for new trial upon the filing of the remittitur upon two theories. First, it is argued that the testimony given by the jurors on the hearing of the motion for new trial sustains an implied finding by the trial court to the effect that the jury unanimously agreed on a finding of damages in the amount of $30,000 and, only after such unanimous agreement, agreed to add $12,500 as representing the allowance to the plaintiff for her attorney's fees. Second, and in the alternative, it is argued that, even if there was not unanimous agreement among the jurors as to the amount to be found as damages represented by the properly considered elements of damage, the least figure fixed by any juror as to the amount to be so found for such properly considered elements was $30,000 and the most allowed by any juror for attorney's fees was $12,500. The contention is then made that any error in relation to the jury's misconduct in the

discussion of attorney's fees was made harmless by the remittitur.

■■■ The trial court's order overruling the motion for new trial (after remittitur) implies such finding of facts, if any, as is supported by the record and which sustains such order. State v. Wair, 163 Tex. 69, 351 S.W.2d 878; Ruffo v. Wright (Tex.Civ.App.), 425 S.W.2d 663, no writ hist. Where the jury has been guilty of misconduct in considering an improper element of damage, and where the amount added to the damage finding because of such misconduct is capable of definite and accurate ascertainment, the taint of the misconduct can be removed by remitting the tainted amount of the damage finding and judgment properly may be rendered for the untainted portion of the finding. Texas Employers' Ins. Ass'n v. Lightfoot, 139 Tex. 304, 162 S.W.2d 929; United Fidelity Life Ins. Co. v. Holliday (Tex.Civ.App.), 226 S.W.2d 139, writ ref., n. r. e. Thus, if the record here showed facts from which the trial judge could have found that the members of the jury unanimously agreed that the plaintiff should be awarded $30,000 for the damages represented by the properly considered elements, and, after reaching such agreement, decided to add $12,500 for attorney's fees, such finding would be implied from the trial judge's order overruling the motion for new trial on condition of plaintiff's remitting that amount represented by the attorney's fees. There is, however, nothing in the record to support any such implied finding. No juror testified that all jurors agreed to a finding of $30,000 as representing the amount of damages resulting from those elements of damage set out in the special issue submitted to them and properly considered by them. No juror testified that the sum added by the jury to the damage finding to compensate the plaintiff for attorney's fees incurred was the specific sum of $12,500. There is, therefore, no support for any implied finding that would permit the taint of misconduct in discussing attorney's fees to be cured by remittitur.

The appellee argues that, even if the record did not show that the jury had agreed on a definite sum as damages before adding another sum as attorney's fees, nevertheless the record would support an implied finding that the minimum amount that any juror would have found as compensation for the properly considered elements of damage was $30,000 and that the maximum amount added for attorney's fees by any juror was $12,500 so that the error, if any, in curing the misconduct by remittitur, was harmless error. As to that proposition, the Texas authorities are in dispute. Cited in support of appellee's contention are Webster v. Isbell (Tex.Civ. App.), 71 S.W.2d 342, rev. on other grounds, 128 Tex. 626, 100 S.W.2d 350 (Tex.Com. App.), opinion adopted; Bilbo v. Lewis (Tex.Civ.App.), 45 S.W.2d 653, err. dismd.; and Estep v. Bratton (Tex.Civ.App.), 24 S.W.2d 465, no writ hist. A leading case to the contrary is City of Waco v. Darnell (Tex.Com.App., holdings approved), 35 S.W.2d 134. See also Union Bus Lines v. Moulder (Tex.Civ.App.), 180 S.W.2d 509, no writ hist., and Parris v. Jackson (Tex.Civ.App.), 338 S.W.2d 280, no writ hist. The appellee points out that at the date of the decision in the Darnell case the law was to the effect that harm was presumed from the showing of misconduct whereas, since the adoption of Rule 434, Texas Rules of Civil Procedure, the "harmless error" rule, a case should be reversed only if the attempt to cure the misconduct by remittitur was "reasonably calculated to cause * * * the rendition of an improper judgment in the case * * *." That question, however, need not be resolved here. There is no evidence in this record which would sustain a finding by the trial court, implied or otherwise, as to the maximum amount any juror agreed to allow as attorney's fees or the minimum amount that any juror agreed to allow as damage for the properly compensable items. Under Rule 301, T.R.C.P., "The judgment of the Court shall conform to the pleadings, the nature of the case proved and the verdict, if any, * * *" Here we have

no untainted verdict, and no verdict from which the taint can be removed by remittitur. To affirm the trial court's judgment would be tantamount to allowing the trial judge to set aside the tainted verdict as to damages and to substitute his own findings therefor. The remittitur filed by the plaintiff cannot properly be said to have removed the harmful effect of the jury's misconduct in discussing attorney's fees. The trial court erred in overruling defendant's motion for new trial based upon such misconduct.

There are numerous other points of error in appellant's brief. Those other points that have properly been presented have been considered and are overruled. For the error above discussed the judgment of the trial court is reversed and the case remanded.

Reversed and remanded.

BARRON, Justice (dissenting).

I respectfully dissent. While I concur with the majority that this case must be reversed, I would reverse and render in favor of appellant.

The evidence shows that Mrs. Russell was a widow of the age of 79 at the time of the accident which occurred on October 18, 1965. The accident happened shortly after 11:00 a. m. on said date at the Harris County Domed Stadium, Houston, Texas. Mrs. Russell was visiting the stadium with her sister and a friend and taking a paid guided tour of the stadium. The accident occurred on the fifth floor of the stadium at the west entrance to the press boxes, on a step dividing a split elevation entrance to the press boxes. The step in question is wide in length and was described as being about as wide as the courtroom in which the trial was held. There is a corridor or walkway between the involved step and the press box area which is approximately eight feet wide. Mrs. Russell could not point out precisely where she fell, but she did limit it to the general area. While there was much dispute con-

cerning the depth of the riser to the tread of the step, in my opinion, the jury was justified from the testimony of her attorney in believing that there was an 8⅞₆ inch riser approximately on the first step at the place where appellee pointed out she fell. The jury was also justified in believing that the tread of the step was 12 inches. There was only one step involved. From the top surface, one step down and one additional step to the lower level was required to enter the area. Mrs. Russell testified that she fell by reason of the depth of the first step. Only about 11⅛₆th of an inch is possibly involved under any theory.

The entire area in question is constructed of concrete and is covered with a non-skid finish. There were no handrails at the step in question. In addition to tours, the area is used by the general public for ball games. The testimony shows that at the time of trial a large number of people, estimated at 600,000, had used the step, and that no other accidents had been reported by reason of such use. Mrs. Russell's group was led by a tour guide, and at each point of interest the guide would group the people together and give a little spiel on the point of interest. On a given signal by the guide, the group would move on to the next point. This particular tour was a leisure tour for elderly people. Mrs. Russell expressed a strong desire to view the press boxes because many important people had been there and she had read about it. There were about 40 people in her group, and before she started to use the step, about one-half of that number had gone down into the area and she had observed them. The guide had preceded appellee to the lower level and was apparently waiting for the entire group to get there. Mrs. Russell was near the step, and she put her right foot out and stepped down. She testified that the step was deeper than she thought, deeper than an ordinary step, and it threw her. As a result thereof she fell down on the concrete floor and sustained personal injuries.

Mrs. Russell had never before been to the fifth floor of the Astrodome and had never before used the particular step. However, she testified that the entire area was well lighted and that there was nothing concealed. She could plainly see the place where she stepped. There was no debris or any rubbish on the floor, and the place was clean. She saw no defects in the step and none were shown. She testified that it was open, apparent and obvious to her. Appellee further testified that she thought she could move down on the step, but is was too deep for her, and that when she began to step down and when she reached the step it was deeper than she thought and "it threw me." When she judged the depth of a step she simply looked at it as she came to it. Her eyesight was good and her depth perception was normal. She could see the place where she was stepping, and she did not slip. Neither was she distracted nor was there any foreign substance on the step. Mrs. Russell was shown to be an unusually robust woman considering her age.

The Astrodome was built by Harris County, Texas, which employed as architects the firms of Wilson, Morris, Crain & Anderson and Lloyd and Morgan. H. A. Lott, Inc. was general contractor. Plans and specifications were prepared by the architects and were presented to the City of Houston for a building permit. A building permit was issued to Harris County, and the plans and specifications apparently complied with the building code of the City of Houston applicable to the construction of the Astrodome. Talbott Wilson, the architect, stated that there is no requirement under the Houston Building Code for a handrailing on the step in question, and that the single step is not a "stairway" under the building code. There was much dispute concerning the applicable building code, but no issues of fact were submitted to the jury relative to the alleged violation thereof or compliance therewith. The various

codes were used for comparison, presumably on the question of what a reasonable step would be so far as depth is concerned. Section 2870 of the Houston City Code of 1942 was introduced into evidence to show that "stairways" were required to have handrails. The evidence conclusively shows, however, that the 1963 building code was adopted by the City of Houston on March 20, 1963, and that the Astrodome was built under a special code which applied to the stadium exclusively. The stadium building permit was issued on March 6, 1963. Mr. Wilson, the architect, further testified that the 1942 code had no application to the construction of the fifth floor, and that the area involved does not fall under the code definition of a stairway. The area and place of the fall is known and described as a concourse. He testified that a handrail is not required at such place. Wilson testified that a stairway is a connection between two floors or levels of a building, and that it is required to be enclosed and have a fire door to it. He testified that the place of the fall is a change of elevation within an identical level or floor, more or less as a curbing is a change of elevation in a street.

Charles Marley Green, an architect called to testify by appellee, testified to a formula for constructing steps. He testified that the better formula is that the sum of the rise and the tread should equal seventeen to seventeen and one-half inches, and that such is the commonly-known rule that is used for stairways. In the case of a public building the witness testified that the maximum rise of a step should be $7\frac{3}{4}$ inches and "that is a little bit more than allowed." He testified that all "stairways" should have handrails and that the steps should be uniform. It is extremely difficult to get each step of identical height. Consequently $\frac{3}{16}$ths of an inch is recognized as an allowable tolerance in both the tread and the rise. The witness stated that the involved step or steps did not fit within generally accepted architectural principles, but he was talking about "stairways".

Green further testified that when he looked at the step at the west entrance from the top level down to the lower level the depth of the step was not readily apparent to him from where he stood. He gave as his reason that the color of the concrete was the same on the steps on both landings, and therefore it was difficult for him to judge the variation. Mr. Routzong, Director of Stadium Operations, however, testified that Torginal was not on the floor at the time of the accident in 1965, but that a substance called Sanifene was there. Sanifene creates a sheen on the floor.

County Judge Bill Elliott testified that Houston Sports Association, Inc. had no right to alter the involved steps under the express terms of the lease contract between appellant and the county. The lease was never admitted into evidence, but the portion of the contract above referred to was read to him and was acknowledged to be a portion of the lease contract. Harris County hired the architects and consulted with appellant relative to the plans and specifications. The Astrodome was completed in April, 1965. The accident occurred approximately six months after appellant took possession thereof. Appellant was familiar with the steps involved, but there is no evidence that any employee of appellant knew the actual height of the step.

Lamar L. Monkres, chief plan checker in the Building Inspection Department of Public Works, City of Houston, testified that the place where the accident happened is not a stairway, and that about $8\frac{1}{2}$ inches would be the maximum approved riser in a stadium such as the Astrodome. He further testified, however, that over $7\frac{1}{2}$ inches would be a violation of the 1942 and 1963 codes for a stairway, and that the place of the accident was not a stairway. He testified that $8\frac{1}{2}$ inches is permitted in this case.

We must, of course, view the competent testimony from appellee's standpoint. An issue of fact is raised if, discarding all adverse evidence, and giving credit to all evidence favorable to plaintiff, and indulg-

ing every legitimate conclusion favorable to plaintiff which might have been drawn from the facts proved, the jury might have found in favor of appellee, Mrs. Russell.

The doctrine applicable here is most elusive and difficult. Some cases seem to indicate that there is a tendency to be sparing in the use of the concepts of "no duty" and volenti non fit injuria. The doctrine of assumed risk embodies two separate concepts. Assumed risk is thought of as negativing the duty owed by the defendant to the plaintiff, particularly the duty of an owner-occupier to persons coming upon his premises. Such concept is known as *no duty*. The plaintiff must show the existence of a duty and its breach, and the no duty rule is a part of plaintiff's case and is not termed a defense. *Volenti non fit injuria* is a defense, and in its application the plaintiff assumes the risk when he deliberately chooses to encounter a risk created by the defendant's breach of duty toward him. The doctrine embodies the element of an intelligent choice and presupposes the existence of a duty. In a *volenti* situation, the burden of pleading, proof and submission of issues is upon the defendant. See Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Tex.Sup.).

"No duty" is the term given to assumed risk in Texas in situations where the plaintiff is injured on the defendant's premises. The doctrine is that the occupier of land owes his invitees a duty to keep the premises in a reasonably safe condition or to warn them of dangers. But the occupier owes no duty if the invitee knows about the condition and appreciates the danger, or if the dangerous condition is so open and obvious that the invitee will be charged in law with knowledge and appreciation of the danger.

In the present case the appellee admits that the step was open and obvious and that there was nothing concealed. She could see the place where she stepped, and the step was not defective. Her eyesight was good, and she stated that she simply mis-judged the depth of the step after looking at it. The fact that the witness Green testified that the depth of the step was not readily apparent to him from where he stood because the color of the concrete was the same on the steps on both landings, does not alter the rule which we should apply here. Variations in color could as easily and logically be given as an excuse. The owner-occupier of premises is not an insurer, and he has no duty to protect an invitee against dangers which are well known and obvious. Hall v. Medical Bldg. of Houston, 151 Tex. 425, 251 S.W.2d 497; Delhi-Taylor Oil Corporation v. Henry, 416 S.W.2d 390, 392 (Tex.Sup.); McElhenny v. Thielepape, 155 Tex. 319, 285 S.W.2d 940; A. C. Burton Co. v. Stasny, 223 S.W.2d 310 (Tex.Civ.App.), writ ref. Appellant had a right to assume that its invitees on the premises would exercise ordinary circumspection as to their footing and would not be oblivious to a static condition or volunteer an act such as the one involved whose danger was so open and obvious to anyone who looked. See Marshall v. San Jacinto Bldg., 67 S.W.2d 372 (Tex.Civ.App.), writ ref. An occupier owes no duty to the invitee if the condition is so patently open and obvious that the plaintiff must have seen and appreciated it. Under such circumstances the court will charge the plaintiff with knowledge of the condition, and with such knowledge and appreciation the plaintiff nevertheless proceeds, the duty of the occupier is zero. Scott v. Liebman, 404 S.W.2d 288, 293 (Tex.Sup.); Robert E. McKee, General Contractor Inc. v. Patterson, 153 Tex. 517, 271 S.W.2d 391, 393–394 (Tex.Sup.).

But the appellee urges that we should apply the rule that negligence is a question of fact for the jury, resolved by the jury in favor of appellee in this case, when the evidence shows that the appellee, with knowledge or chargeable with knowledge of the danger, exercised some care. See Lang v. Henderson, 147 Tex. 353, 215 S.W.2d 585, 587; Dunlap v. Executive Inn Motor Hotel Corp., 404 S.W.2d 842 (Tex.Civ.App.),

writ ref., n. r. e.; Gulf, C. & S. F. Ry. Co. v. Gascamp, 69 Tex. 545, 7 S.W. 227. The application of such a rule is not entirely unappealing. I feel, however, that the plain facts proven in the case at bar, under the decisions of our Supreme Court, require that we apply the "no duty" rule discussed above. In attempting to step down upon a surface which was clearly visible to her and which surface was not in any respect defective, but which she admitted was open and patently obvious, I believe the law requires that we hold that Houston Sports Association, Inc. owed no duty to Mrs. Russell under the circumstances.

I do not believe that what I have said conflicts with such cases as Wesson v. Gillespie, 382 S.W.2d 921 (Tex.Sup.), where a relatively minor and unlighted condition existed, where the injured party had encountered the condition many times, and where the injured party admitted that she knew of the condition, knew it was dangerous, and appreciated the particular danger; Ellis v. Moore, 401 S.W.2d 789, 792–793 (Tex.Sup.); Hausman Packing Co. v. Badwey, 147 S.W.2d 856 (Tex.Civ.App.), writ ref.; J. & W. Corporation v. Ball, 414 S.W. 2d 143 (Tex.Sup.); Acme Laundry Company v. Ford, 284 S.W.2d 745 (Tex.Civ. App.), writ ref., n. r. e.; Stephenson v. Camp, 311 S.W.2d 512 (Tex.Civ.App.), writ ref., n. r. e., and other decisions. There is no evidence that appellee was entrapped or that she was injured as a result of any hidden defect in the step. Nor do I believe that appellee's first encounter with this particular step under the circumstances should alter the rule when the condition was so open and obvious to her and when "the hall of dangers" was in fact not more dangerous than any other similar step to a person with ordinary circumspection. The condition was static and part of the permanent construction.

The only exception might be that appellee's age alone alters the rule. Under the circumstances, I do not believe that age alone should alter it. If a person is not charged as a matter of law with knowledge and appreciation of an ordinary danger under these facts, I believe the "no duty" rule in similar situations might effectively be abolished so far as realities are concerned. I believe the same rule applies insofar as the handrailing is involved.

I would reverse the judgment of the trial court and render judgment in favor of the appellant.