COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| NEW HAMPSHIRE INSURANCE COMPANY, SUNSETS WEST, INC., and R.M. PERSONNEL, INC. | § § § | No. 08-15-00173-CV |
| Appellants, | § | Appeal from the |
| v. | § | County Court at Law No. 3 |
| LUIS ALBERTO RODRIGUEZ, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2007-5339) |

## O P I N I O N

After suffering severe on-the-job injuries at a construction site, Luis Rodriguez received workers' compensation benefits worth more than $1.8 million from the insurance carrier of the prime contractor construction company that directed his day-to-day work activities. Separately, in a suit he filed against the temporary staffing agency that hired him for the job and a subcontractor he alleged negligently caused his injuries at the worksite, Rodriguez obtained an approximately $6.1 million jury award. The prime contractor's workers' compensation carrier now seeks reimbursement of its expenses from Rodriguez's jury award. The temporary staffing agency and the allegedly negligent subcontractor ask us to vacate that jury award entirely.

For the reasons that follow, we will: (1) affirm the judgment with respect to R.M. Personnel; (2) modify the prejudgment interest date with respect to Sunsets West, Inc. (SWI), and

affirm the modified judgment with respect to SWI; and (3) reverse the trial court's judgment with respect to New Hampshire Insurance Company and render judgment that denies jury award reimbursement but lifts the condition requiring New Hampshire Insurance to pay out certain benefits before treating the jury award as an advance against future benefits.

## BACKGROUND

### *Factual History*

This case involves a catastrophic worker injury sustained at a construction site located on 211 North Florence Street in El Paso, Texas (the Florence Street Project). General contractor and project architect Perspectiva—whose principals, through a separate limited partnership, owned the property under construction—used temporary employment agency R.M. Personnel, Inc., to hire temporary workers for the Florence Street Project. Rodriguez, through R.M. Personnel, was assigned to the Florence Street Project under the supervision of Perspectiva Superintendent Jorge Acosta. Rodriguez was a general laborer with no specialized training in working from heights or fall hazards. According to R.M. Personnel, for these reasons and per the terms of its agreement with Perspectiva, Rodriguez should not have been assigned to work on the third floor of the Florence Street Project. Acosta disputed R.M. Personnel's version of events, and maintained at trial that Rodriguez was not subject to any worksite restrictions.

Perspectiva subcontracted out sheet rock work and interior wall construction on the Florence Street Project to Sunsets West, Inc. (SWI). While the Florence Street Project was in progress, but before Rodriguez began as a worker on the project, Perspectiva asked SWI to alter the scope of its work by constructing a 10-foot-by-14-foot wooden deck installed over four cinder-block walls that extended four feet above the existing roof. SWI agreed to perform the work requested. The deck, referred to in the briefs as an "elevator penthouse," was situated above an

2

open elevator shaft that was three stories tall. Per Jorge Acosta's instructions, SWI left a two-foot-by-four-foot rectangular opening in the deck so that a louvered vent could be installed later. The opening was approximately six feet from the edge. SWI did not mark off or otherwise secure the area around the open hole in the elevator penthouse. It is undisputed that once Perspectiva approved SWI's construction work on the elevator penthouse on August 30, 2007, SWI returned to its work in the interior of the building.

On September 1, 2007, Acosta placed a sheet of plastic, some sheet rock, and an angle iron over the vent opening in order to keep rain from falling into the main building. The rock covering could not support the weight of a person standing on top of it. On September 17, 2007, Acosta told Rodriguez to help him place felt paper over the vent opening to prevent water seepage. The record is unclear as to whether the temporary covering was still over the open elevator shaft as work began or whether it had been removed.

Only Acosta and Rodriguez were on the roof as the work began. Acosta testified that Rodriguez climbed up scaffolding that SWI had left at the edge of the elevator penthouse, and was standing on the last wrung at the top of the scaffolding. Acosta conceded at trial that he later learned this was an OSHA violation. Acosta did not warn Rodriguez about the roof opening. Thereafter, Rodriguez fell three stories down the elevator shaft onto the cement basement floor fifty feet below. The precise sequence of what happened between Rodriguez being on the scaffold and falling through the elevator shaft opening six feet away is unknown. Acosta was turned away from the accident and did not see how Rodriguez fell, but only saw Rodriguez's hands in the air before disappearing into the elevator shaft. It is also unclear from the record whether the covering was on top of the vent opening at the time of Rodriguez's fall.

Rodriguez sustained massive trauma, suffering a severe brain injury, spinal cord injuries,

3

internal bleeding, and multiple fractures of bones in his face, spine, pelvis, ribs, arms, and legs. A witness at trial testified that Rodriguez's injuries were so severe, a priest was called to the hospital to administer the last rites to Rodriguez. Rodriguez, then twenty-five-years' old, ultimately survived. However, he is incapable of living independently. As of the date of trial, Rodriguez was thirty-three and had assisted living care. He can walk, but only with assistance. Appellant New Hampshire Insurance Company states in its brief that the severity of Rodriguez's injuries entitle him to lifetime workers' compensation benefits. Rodriguez testified at trial that he had no independent recollection of the accident or of ever even working on the Florence Street Project. His last memory was working at a grocery store prior to the accident.

### *Procedural History*

*Subrogation Suit and Contested Workers' Compensation Case Between Insurance Carriers*

The procedural history of this case is complex. On December 4, 2007, employment agency R.M. Personnel's workers' compensation insurance carrier, Liberty Mutual Fire Insurance Company (Liberty Mutual), filed a subrogation suit under Chapter 417 of the Texas Labor Code against Perspectiva, asserting that Perspectiva's negligence caused Rodriguez's injury and that Liberty Mutual was fully subrogated to Rodriguez's rights and bringing suit pursuant to that subrogation (the Liberty Mutual Suit).[1] Liberty Mutual later amended its petition to include SWI as a defendant. The first amended petition naming Perspectiva and SWI as co-defendants states it was served on April 15, 2008, but the district clerk's stamp indicates it was received and filed on April 22, 2008.

Meanwhile, a dispute arose between Liberty Mutual and Perspectiva's workers' compensation carrier, New Hampshire Insurance Company, over which carrier should be

---

[1] R.M. Personnel was not a party to the Liberty Mutual suit.

4

responsible for paying benefits to Rodriguez. That aspect of the dispute moved into a contested administrative case, styled *Luis Rodriguez v. Liberty Mutual Fire Insurance and New Hampshire Insurance Company*, before the Texas Department of Insurance Workers' Compensation Division. The Division held a benefit review conference on February 19, 2009, but the parties were unable to reach an agreement at that time. After a contested hearing scheduled for April 8, 2009, was reset, the Division held a final contested hearing on July 28, 2009. The contested issue before the Division was: "Was RM Personnel or Perspectiva the Claimant's employer for the purposes of the Texas Workers' Compensation Act at the time of the injury . . .?" The Division found that because Perspectiva controlled the details of Rodriguez's work while he was at the job site, Perspectiva and not R.M. Personnel was Rodriguez's employer under the Act. As such, Perspectiva's carrier—New Hampshire Insurance Company—was liable for benefits and R.M. Personnel's carrier—Liberty Mutual—was not liable. The Division ordered New Hampshire Insurance to reimburse Liberty Mutual for the benefits it paid Rodriguez, and to pay Rodriguez's workers' compensation benefits from that point forward. The record before us does not show that that order was ever appealed.

*Rodriguez's Lawsuit*

On September 16, 2009, in a separate lawsuit, Rodriguez sued Perspectiva and SWI (the Rodriguez Suit), contending that both defendants caused his injuries. SWI moved to consolidate the Rodriguez Suit with the Liberty Mutual Suit, which the trial court granted on December 11, 2009. After consolidation, Liberty Mutual non-suited its remaining claims and exited the case. SWI sought to have R.M. Personnel designated as a responsible third party. The trial court granted that request, and Rodriguez timely amended his petition to include R.M. Personnel as a defendant on November 2, 2010. R.M. Personnel was served on March 9, 2011. New Hampshire Insurance

then intervened in this consolidated suit on June 9, 2011.

On November 23, 2011, R.M. Personnel moved for summary judgment, arguing that it was immune from suit under the Worker's Compensation Act's exclusive remedy provisions because it was Rodriguez's "employer" for purposes of the Act. Thereafter, Perspectiva declared bankruptcy.[2] Rodriguez, SWI, and New Hampshire Insurance all filed responses to R.M. Personnel's motion for summary judgment, largely adopting each other's arguments by reference and arguing either that R.M. Personnel was collaterally estopped from asserting the exclusive remedy defense by the Division's order or, alternatively, that R.M. Personnel was not Rodriguez's employer under the Act. The trial court denied R.M. Personnel's motion for summary judgment.

Ultimately, Rodriguez faced three parties at trial: New Hampshire Insurance, the intervenor and general contractor's workers' compensation carrier; R.M. Personnel, the employment agency who hired him to work on the Florence Street Project; and SWI, the subcontractor that created the elevator penthouse deck.

Pre-trial, Rodriguez and New Hampshire Insurance stipulated that New Hampshire Insurance had paid out $1,890,967.87 in workers' compensation benefits thus far, thereby obviating New Hampshire Insurance's need to participate in trial as to benefits. At trial, the jury found Rodriguez sustained $20,500,000.00 in damages. The jury also found that Perspectiva, SWI, R.M. Personnel, and Rodriguez were all negligent, apportioning proportional negligence percentages as follows:

- Perspectiva (as non-defendant responsible third party): 61%

- R.M. Personnel: 17%

- SWI: 11%

---

[2] Rodriguez eliminated Perspectiva as a defendant in this case on August 11, 2014.

- Rodriguez: 11%

The trial court rendered a judgment awarding Rodriguez $6,166,222.72 from the defendants. Specifically, the judgment states that Rodriguez would receive $2,422,444.64 from SWI[3] and $3,743,778.08 from R.M. Personnel.[4] The judgment also provided that New Hampshire Insurance take nothing against Rodriguez by way of reimbursement. However, New Hampshire Insurance did receive a credit against future benefits totaling $4,066,648.67 which could only be applied after New Hampshire Insurance paid Rodriguez $11,542.588.75 in total benefits.

New Hampshire Insurance, SWI, and R.M. Personnel all appealed.

## DISCUSSION

The three Appellants in this case collectively raise twelve issues. For clarity purposes, we divide our discussion into three sections and deal with the individual issues Appellant by Appellant.

### A.

### ISSUES RAISED BY SWI

### 1.
### *Liability for Open and Obvious Hazards*
### *(SWI Issues One and Two)*

SWI advances two principal arguments against liability. In Issue One, SWI denies that it created a dangerous condition by building a roof deck with a hole in the middle situated over an empty elevator shaft, contending that opening was simply an antecedent condition that set the stage for the actual dangerous condition: the supervening placement of an inadequate covering over the

---

[3] Actual damages: $2,255,000 (11 percent of the jury's $20.5 million damages award); prejudgment interest: $167,444,64.

[4] Actual damages: $3,485,000 (precisely 17 percent of the jury's $20.5 million damages award); prejudgment interest: $258,778.08.

opening by Acosta. In Issue Two, SWI maintains that even if it did create a dangerous condition, SWI had no duty to warn Rodriguez or otherwise make the area safe because at the time it surrendered control of the work area to Perspectiva, the hazard was open and obvious, thereby relieving it of any duties to Rodriguez.

*Standard of Review and Applicable Law*

The existence of a duty is a legal question. "A landowner has a duty to exercise reasonable care to make the premises safe for invitees." *Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 202 (Tex. 2015). A person who does not own or possess real property cannot be held liable in a premises liability case for an injury arising on that property unless the non-landowner creates a dangerous condition on the property or else agrees to make a known dangerous condition safe and fails to do so. *City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986). At that point, the non-landowner owes the same duty of care to invitees as does a landowner. *Id.*

A premises-holder's duty of reasonable care to invitees encompasses "a duty to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Austin*, 465 S.W.3d at 203. "Ordinarily, the landowner need not do both, and can satisfy its duty by providing an adequate warning even if the unreasonably dangerous condition remains." *Id.* However, if the hazard is open and obvious to the invitee, then the premises-holder "is not in a better position to discover it." *Id.* "When invitees are aware of dangerous premises conditions—whether because the danger is obvious or because the landowner provided an adequate warning—the condition will, in most cases, no longer pose an unreasonable risk because the law presumes that invitees will take reasonable measures to protect themselves against known risks, which may include a decision not to accept the invitation to enter onto the landowner's premises." *Id.* As such, "since there is no need to warn against

8

obvious or known dangers, a landowner generally has no duty to warn of hazards that are open and obvious or known to the invitee." *Id.* at 204. Even so, the Texas Supreme Court has recently recognized that in some situations, even where a hazard is open and obvious to an invitee or where a warning is given, a landowner must still take affirmative steps to mitigate invitee exposure to the hazard in order to meet the standard of reasonable care. *Id.* "The first exception may arise when a dangerous condition results from the foreseeable criminal activity of third parties [i.e., the criminal activity exception] . . . [and] [t]he second exception may arise when the invitee necessarily must use the unreasonably dangerous premises, and despite the invitee's awareness and appreciation of the dangers, the invitee is incapable of taking precautions that will adequately reduce the risk [i.e., the necessary-use exception]." *Id.*

**a.**
**Dangerous Condition/Proximate Cause**

We first reject SWI's contention that the open-holed roof deck situated above an empty three-story elevator shaft it created was not a dangerous condition. An open hole fifty feet above a concrete floor is not merely a benign antecedent condition that could later create some speculative hazard, like a vending machine that unexpectedly drops a cube of ice onto a supermarket floor. *Compare Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407 (Tex. 2006). An unsecured hole in the roof of a construction site over an unobstructed three-story drop is a dangerous condition in and of itself. Case law makes this abundantly clear. *See Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 452–53 (Tex. 2006)(removal of rope barricade around hole in oil derrick walkway was not a supervening cause of plaintiff's falling accident because rope barricade "did not fundamentally alter the foreseeable consequences of . . . original negligence" in leaving hole open); *Bennett v. Span Indus., Inc.*, 628 S.W.2d 470, 472-73 (Tex.App.—Texarkana 1981, writ ref'd n.r.e.)(openings for skylight installations on roof were

9

dangerous condition at construction site where subcontractors were performing roof work); *Hendrix v. Jones-Lake Const. Co.*, 570 S.W.2d 546, 550 (Tex.App.—Corpus Christi 1978, writ ref'd n.r.e.)(same).

SWI argues that it cannot be held liable for Rodriguez's injuries because Perspectiva placed an inadequate cover on the hole, which was what made the hole dangerous in fact. But while the inadequate cover that Perspectiva placed over the hole may have contributed to the accident, it was not a supervening cause of Rodriguez's injuries that would absolve SWI of liability. There can be more than one proximate cause that leads to an injury, and whether an intervening cause constituted the sole proximate cause of an injury depends on whether the intervening cause breaks the inferential chain between the original wrongful act and the injury. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97–98 (Tex. 2016). A supervening cause cuts off liability stemming from earlier-in-time causes when it "destroys the causal connection" between "the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause[.]" *Id.* at 97. However, if the later-in-time cause "'concurs with the continuing and co-operating original negligence in working the injury,'" the cause is considered to be a concurring cause in the injury. *Id.* at 98. Foreseeability is one key factor in distinguishing between concurring and supervening causes; "[i]f the intervening cause and its probable consequences are a reasonably foreseeable result of the defendant's negligence, the intervening cause is a concurring cause[,]" but "if nothing short of prophetic ken could have anticipated the happening of the combination of events by which the original negligence led to an intervening force that resulted in the plaintiff's injury," the intervening cause is an unforeseeable superseding cause. [Internal quotations omitted, alterations added]. *Id.* at 98. "Other factors we consider are whether the original negligence caused the intervening force to occur and whether the negligence operated with the intervening

10

force in creating the harm." *Id.* at 98–99. "[F]orseeability does not require that the exact sequence of events that produced an injury be foreseeable." *Cty. of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002). "Instead, only the general danger must be foreseeable." *Id.*

*Dew* guides our decision on this point. In *Dew*, the Texas Supreme Court held that the removal of a rope barrier around an open hole in an oil derrick was a concurring cause of the plaintiff's injury, not a supervening cause, reasoning that the two conditions acted in conjunction with one another in causing the fall injury at issue. *Dew*, 208 S.W.3d at 452–53. Likewise, we believe that the addition of an inadequate covering over the hole in this case was a concurring cause, not a supervening cause; the obstruction of the hole with an inadequate covering caused the injuries in conjunction with the inherently dangerous nature of the hole itself. There is no proximate cause problem here. The risk of injury and general danger was foreseeable.

### b.
### Duty to Warn or Make Safe

SWI next asserts that even if the state of the elevator shaft roof deck presented a dangerous hazard, SWI owed no duty to either secure the opening or warn others like Rodriguez of its existence because at the time the company surrendered the premises back to Perspectiva, the hazard was open and obvious. Rodriguez counters that the evidence did not show the danger presented by the hole was open and obvious as a matter of law. Specifically, Rodriguez maintains there was no apparent way to know the depth of the opening without exposing himself to the danger of looking into the hole. In support of this argument, he cites *Harris Cty. v. Eaton*, 561 S.W.2d 245, 246 (Tex.App.—Houston [14th Dist.] 1978), *aff'd*, 573 S.W.2d 177 (Tex. 1978), in which a pothole visible from a distance was held not to be an open and obvious danger because its depth could not be determined from a distance; and *Hous. Sports Ass'n v. Russell*, 450 S.W.2d 741, 746 (Tex.App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.), in which the Fourteenth Court held that

11

an unusually deep step along a walking path was not an open and obvious danger, given both the fact that its depth could not be readily ascertained when walking downward and the fact that the step was in an area frequented by tour groups whose members might be distracted by looking at various aspects of the stadium around them rather than the walking path. Rodriguez also cites *Hendrix*, which, much like this case, involved a construction worker falling through an unsecured roof opening left open for the later installation of a skylight. *See Hendrix*, 570 S.W.2d at 550. SWI distinguishes *Hendrix* by arguing that in that case, there was ample testimony that various layers of dark felt paper tended to camouflage the otherwise open and obvious hazard of the dark skylight opening, especially during overcast days like the day on which the accident occurred, *id.* at 550–51, whereas in this case, there was no evidence the edges of the opening would have been obscured at the time SWI surrendered the premises to the general contractor—prior to the placement of the inadequate cover that actually obscured the opening.

This case presents many interesting questions regarding application of the open and obvious doctrine, such as whether we measure the openness and obviousness of a hazard from the point of a subcontractor's surrender of the premises to the general contractor or from the point of injury, and whether, even if a hazard is open and obvious at the time of surrender, a foreseeable intervening circumstance could obscure the obviousness of the hazard such that the hazard-maker should still be subject to liability for failing to make the hazard safe prior to surrender. But we expressly decline to answer these thorny questions related to the open and obvious doctrine because we can uphold the jury's verdict on alternate, more straightforward grounds: SWI affirmatively agreed to make the premises at issue safe as part of its subcontract. Because the subcontract is evidence that SWI agreed to make dangerous conditions safe, SWI owed a duty of ordinary care to rectify dangerous conditions on the premises. Its failure to do so was a proximate

12

cause of Rodriguez's injury.

"One who agrees to make safe a known dangerous condition of real property owes a duty of due care." *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 54 (Tex. 1997); *see also City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986)(holding that "a private person who agrees to make safe a known, dangerous condition of real property may be liable for the failure to remedy the condition"). Here, there was legally sufficient evidence to show that SWI agreed to make dangerous conditions safe by virtue of the subcontract it signed with Perspectiva. SWI does not contest that it signed a written subcontract with Perspectiva. Section 11 of SWI's Subcontract, titled "COMPLIANCE WITH LAW AND SAFETY," states in relevant part:

> SUBCONTRACTOR agrees to comply in all respects with federal, state and local law applicable to the prosecution of work under this Subcontract Agreement. Such Compliance shall include but not be limited to payment by SUBCONTRACTOR of wages to employees or subcontractors. . . . SUBCONTRACTOR'S failure to comply with federal, state and local law applicable to the prosecution of work under this Subcontract Agreement shall be grounds for termination of this Subcontract Agreement.

Rodriguez asserts that the "federal law" outlined in Section 11 encompasses OSHA safety regulations, and he points to testimony in the record from SWI officials acknowledging a contractual duty to follow safety procedures including OSHA regulations. He asserts this evidence shows SWI affirmatively agreed to make safe the premises it controlled. We agree with Rodriguez's assessment. There is evidence showing that SWI agreed to comply with federal law, which encompassed OSHA safety regulations. Testimony from SWI's representatives show that the company also subjectively understood that the Subcontract required it to follow federal safety standards. From this, a jury could surmise under a premises-liability framework that SWI had agreed to make dangerous conditions on the premises it controlled safe, and that as a premises-holder who agreed to make the dangerous condition safe, SWI owed the same duty of ordinary

13

care as any premises-holder toward invitees and others that could be injured as a result of any failure to rectify the dangerous condition.[5]

The scope of SWI's duty in making the premises safe was one of ordinary care. *Lefmark Mgmt. Co.*, 946 S.W.2d at 54. OSHA regulations and other industry standards require subcontractors generally to mitigate hazards they create in performing their work; specifically, any opening must be secured with covers, guardrails, warning lines, tape, rope, or posted warnings. Rodriguez argues that the company's failure to mitigate hazards generally or in the specific ways covered by OSHA regulations breached the make-safe duty with respect to the premises at issue. We agree.

SWI counters that the contractual provisions requiring adherence in all respects with federal law are boilerplate and that the question of whether it complied with OSHA regulations is irrelevant to our premises liability analysis. SWI correctly notes that OSHA regulations do not expand common law duties imposed by state law and do not create an implied cause of action. *See McClure v. Denham*, 162 S.W.3d 346, 353 (Tex.App.—Fort Worth 2005, no pet.); *Richard v. Cornerstone Constructors, Inc.*, 921 S.W.2d 465, 468 (Tex.App.—Houston [1st Dist.] 1996, writ denied)); *see also* 29 U.S.C.A. § 653 (establishing that nothing in the OSHA statute "shall be construed to . . . enlarge or diminish or affect in any other manner the common law or statutory rights, duties or liabilities of employers and employees under any law . . ."). And SWI cites a Fifth Circuit case finding that certain OSHA regulations could not be used to establish negligence per

---

[5] The question of whether a subcontractor that agrees to make a dangerous condition safe as part of a written contract with a general contractor can be held liable by an invitee under a premises liability/negligence cause of action is separate from the question of whether a third party injured by a subcontractor has a cause of action for breach of contract as a third-party beneficiary of the general contractor and subcontractor's subcontract. This case does not involve Rodriguez asserting claims as a third-party beneficiary of the subcontract; this case involves Rodriguez being injured after a subcontractor that created a dangerous condition and agreed to make that condition safe failed to do so. Though the subcontract's provisions inform our understanding of the duties here, the claim here sounds not in contract, but in tort.

14

se. *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706, 707 (5th Cir. 1981).

But this is not a negligence per se case. We also cannot ignore the fact that OSHA standards "are generally relevant as the cumulative wisdom of the industry on what is unsafe." *See Duncan v. First Texas Homes*, 464 S.W.3d 8, 20 (Tex.App.—Fort Worth 2015, pet. denied). Furthermore, SWI does not explain how OSHA standards either contravene or expand upon SWI's common law duty of care. On the contrary, at least in this case, OSHA safety standards regarding unsecured openings seem to track both common sense and other cases discussing the need for unsecured openings to be either secured or at least marked off. *See, e.g., Dew*, 208 S.W.3d at 452–53 (removal of rope barrier around unsecured opening caused foreseeable fall injury). Regardless of whether the jury found that SWI was negligence because it breached the OSHA regulations it was bound itself to follow or because the company breached a general duty of care, the standard set by both is one and the same. *Cf. Bennett*, 628 S.W.2d at 474 (finding ripe fact issue where record evidence showed that OSHA regulations required open skylight on roof of construction project to either be properly covered or surrounded by guardrails). SWI agreed to make dangerous conditions on the premises it controlled safe. It owed a duty of due care to make the dangerous condition of the unsecured opening safe. There was legally sufficient evidence to allow the jury to determine SWI breached that duty. The jury's verdict on this point is not reversible.

SWI's Issues One and Two overruled.

### 2.
### *Prejudgment Interest*
### *(SWI's Issue Three)*

In SWI's Issue Three, the company asserts that the trial court erred by calculating prejudgment interest from the date Liberty Mutual filed its subrogation suit against Perspectiva and SWI rather than the later date on which Rodriguez filed his original petition against SWI.

15

The Texas Finance Code provision dealing with prejudgment interest in this case states, in relevant part:

> [P]rejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered. Prejudgment interest is computed as simple interest and does not compound.

TEX.FIN.CODE ANN. § 304.104.

At the outset, we briefly recount our understanding of the litigation timeline in this case. Liberty Mutual, stepping into Rodriguez's shoes under subrogation principles, first filed a negligence suit against general contractor Perspectiva on December 4, 2007. Liberty Mutual later amended its petition to include SWI as a defendant on April 22, 2008. Finally, on September 16, 2009, Rodriguez filed suit in his own name against Perspectiva and SWI. The two cases were consolidated into one case on December 11, 2009. The trial court entered a judgment calculating prejudgment interest against SWI using the start date of December 4, 2007.

Rodriguez contends that the trial court used the correct date; under the plain terms of the statute, we must calculate prejudgment interest from December 4, 2007, the point all litigation began, even if SWI had not yet been joined as a party as of that date. In support of this argument, Rodriguez cites a memorandum opinion in which the Fort Worth Court of Appeals held that the prejudgment statute requires calculation from the date a lawsuit is first filed, even if the particular defendant against whom a judgment is taken was added a party to the suit in a later pleading. *MBR & Associates, Inc. v. Lile*, No. 02-11-00431-CV, 2012 WL 4661665, at *14 (Tex.App.—Fort Worth Oct. 4, 2012, pet. denied)(mem. op.).

However, another panel of the Fort Worth Court of Appeals previously held that when a plaintiff filed suit against one defendant in one lawsuit and then filed a second separate lawsuit

16

against another defendant that was later consolidated with the first lawsuit, the trial court erred by calculating prejudgment interest as to the second defendant from the date of the first lawsuit; instead, the trial court should have used the date the second defendant was actually sued in order to make its calculation. *Citizens Nat'l Bank v. Allen Rae Investments, Inc.*, 142 S.W.3d 459, 486–87 (Tex.App.—Fort Worth 2004, no pet.). Additionally, both Houston courts have held that prejudgment interest is measured on a by-claim, by-defendant basis from the point where a particular claim is brought against a particular defendant in an original or amended petition. *Tex Star Motors, Inc. v. Regal Fin. Co., Ltd.*, 401 S.W.3d 190, 204 (Tex.App.—Houston [14th Dist.] 2012, no pet.)(prejudgment interest accrues beginning on the date a particular cause of action is filed even if defendant had already been sued on other causes of actions); *see also Christus Health Gulf Coast v. Carswell*, 433 S.W.3d 585, 611 (Tex.App.—Houston [1st Dist.] 2013), *rev'd on other grounds*, 505 S.W.3d 528 (Tex. 2016)(same); *I-10 Colony, Inc. v. Chao Kuan Lee*, 393 S.W.3d 467, 480 (Tex.App.—Houston [14th Dist.] 2012, pet. denied)(same).

We agree with SWI that the date used to calculate prejudgment interest is the date a particular claim was filed against a particular defendant. However, we agree with Rodriguez in part that, under these circumstances, it is not appropriate to use the date he individually filed suit against SWI as the calculation date. When Liberty Mutual filed suit, it did so in its capacity as Rodriguez's subrogee, stepping into his shoes and asserting his legal rights to the extent permitted by the Texas Labor Code. As such, we believe the appropriate calculation date for prejudgment interest purposes is April 22, 2008, the date that Liberty Mutual as Rodriguez's subrogee filed its negligence suit against SWI. At that point, suit against SWI was filed and SWI had notice of the negligence claim.

SWI's Issue Three is sustained, in part. We will reform the judgment against SWI to reflect

17

a prejudgment interest calculation date of April 22, 2008.

**B.**

**ISSUES RAISED BY R.M. PERSONNEL**

We next turn to the issues raised by R.M. Personnel, the employment agency that hired Rodriguez to work for its client company Perspectiva. In Issue One, R.M. Personnel argues that Rodriguez's claims against it are barred under the Texas Labor Code's exclusive remedy provision because—despite the Workers' Compensation Division's administrative ruling to the contrary—R.M. Personnel was Rodriguez's "employer" alongside Perspectiva, and since R.M. Personnel was a subscriber to workers' compensation insurance, it, like Perspectiva, should be immune from suit. In Issue Two, R.M. Personnel asserts that it had no duty to inspect the Florence Street Project job site, or, alternatively, that any breach of such duty did not proximately cause Rodriguez's injuries. In Issue Three, R.M. Personnel maintains that Rodriguez's claims against it are barred by limitations, since Rodriguez did not implead and serve R.M. Personnel until after SWI moved to designate R.M. Personnel as a responsible third party after the statute of limitations had already expired. Finally, in Issue Four, R.M. Personnel contends that the trial court erred by awarding calculating prejudgment interest from the date that Liberty Mutual filed a subrogation lawsuit, rather than the date that Rodriguez impleaded R.M. Personnel into the current suit.

We will deal with the arguments out of order and address procedural issues first.

*1.*
*Limitations*
*(R.M. Personnel's Issue Three)*

We begin with limitations. In Issue Three, R.M. Personnel maintains that the case against it is time-barred because the company was not added as a party to this case until more than a year after the two-year statute of limitations for negligence actions expired. Rodriguez counters that a

provision of the Civil Practices and Remedies Code in effect at the time of suit allowed plaintiffs to bring new defendants into a suit if they were designated as a responsible third party by a co-defendant after the original statute of limitations period lapsed. Because he timely availed himself of that option, Rodriguez maintains his suit against R.M. Personnel survives the limitations challenge. We agree with Rodriguez.

The current version of the Civil Practices and Remedies Code precludes a defendant who has not complied with timely disclosure obligations from designating another person as a responsible third party after the limitations period for a plaintiff's cause of action expires. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 33.004(d). When adopting Section 33.044(d) in 2011, the Texas Legislature concurrently repealed Section 33.044(e), which stated that a plaintiff could pursue a claim against a person designated as a responsible third party within sixty days of designation, even where that claim would otherwise be barred by the statute of limitations. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.03, 2003 TEX.GEN.LAWS 847, 855-56 (enacting Section 33.044(e)), *repealed by* Act of May 25, 2011, 82nd Leg., R.S., ch. 203, § 5.02, 2011 TEX.GEN. LAWS 757, 759 (repealing Section 33.004(e)).

Section 33.004's repeal was effective September 1, 2011. *See* Act of May 25, 2011, 82nd Leg., R.S., ch. 203, § 5.02, 2011 TEX.GEN.LAWS 757, 759. Rodriguez filed his initial suit in 2009. On October 26, 2010, the trial court designated R.M. Personnel as a responsible third party. Rodriguez joined R.M. Personnel seven days later on November 2, 2010, by filing an amended petition naming it as a defendant. Because R.M. Personnel was designated as a responsible third party prior to September 1, 2011, former Section 33.004(e) governs here. And because the joinder was made within sixty days, the statute of limitations did not bar R.M. Personnel's entry into this suit.

19

R.M. Personnel argues that notwithstanding the plain language of former Section 33.004(e), Rodriguez must still show he exercised due diligence in serving it within the statutory period, and no record evidence exists to show Rodriguez exercised due diligence; as such, the suit should be barred. R.M. Personnel cites no authority for this assertion, and we find no support for R.M. Personnel's due diligence argument either in case law or the plain language of the statute. Former Section 33.004(e) is clear. So long as the joinder happens within sixty days of responsible third party designation by another defendant, the joinder is not barred by limitations. Because Rodriguez impleaded R.M. Personnel within seven days of designation, limitations did not stand as a bar to suit.

R.M. Personnel's Issue Three is overruled.

### 2.
### *Immunity from Suit as a Subscribing "Employer"*
### *(R.M. Personnel's Issue One)*

We next turn to R.M. Personnel's assertion of the exclusive remedy defense in Issue One. An employer subscribing to Texas' workers compensation system is exempt from any employee suit for on-the-job injuries; the employee's only remedy for workplace injuries is from workers' compensation benefits paid out by the employer's carrier. *See* TEX.LAB.CODE ANN. § 408.001(a). A worker may have more than one "employer" for purposes of the Act, and each subscribing employer is entitled to exemption from suit. *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 144 (Tex. 2003). R.M. Personnel asserts that it meets the definition of a subscribing employer and thus should be immune from Rodriguez's suit.

Complicating matters in this case is the fact that the Workers' Compensation Division—in an administrative case involving R.M. Personnel's insurance carrier (Liberty Mutual) and Perspectiva's insurance carrier (New Hampshire Insurance Company)—determined that

20

Perspectiva was Rodriguez's employer and that R.M. Personnel was *not* Rodriguez's employer, thereby absolving R.M. Personnel's carrier from liability for workers' compensation benefits. That order was never appealed. While Rodriguez argues against exclusive remedy immunity on the merits, he also asserts that R.M. Personnel is now collaterally estopped from asserting exclusive remedy immunity by virtue of the Division's unappealed order.[6] We agree with Rodriguez on this point. To hold otherwise would be to allow both R.M. Personnel and its insurance carrier to escape liability by taking inconsistent positions at various stages of litigation.

"A party asserting collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, (2) those facts were essential to the judgment in the first action, and (3) the parties were cast as adversaries in the first action." *Walker v. Hitchcock Indep. Sch. Dist.*, No. 01-11-00797-CV, 2013 WL 3771302, at *5 (Tex.App.—Houston [1st Dist.] July 16, 2013, no pet.)(mem. op.). "To invoke collateral estoppel on the basis of a prior administrative order, the party must show that the administrative agency was acting in a judicial capacity and resolve[d] disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." [Internal quotation marks omitted]. *SWEPI, L.P. v. Camden Res., Inc.*, 139 S.W.3d 332, 338 (Tex.App.—San Antonio 2004, pet. denied).

The Division has exclusive jurisdiction over disputes related to whether a claim for workers' compensation benefits is compensable. The administrative process has four tiers: (1) an informal, non-adversarial benefits review conference, TEX.LAB.CODE ANN. § 410.021; (2) a

---

[6] Our power of review in civil cases is constrained by what arguments appear in the parties' briefs, and failure to meet briefing standards may result in a court of appeals not reaching a particular issue. *Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.*, No. 08-17-00227-CV, 2018 WL 4057283, at *11 (Tex.App.—El Paso Aug. 24, 2018, no pet.). Mentioning in an issue in passing, even with citation to case law, may not be enough to assign an issue for review "if the link between the conclusion and the case is not obvious" and there is no substantive analysis bridging the gap between a legal assertion, the law, and the facts of the case. *Id*. at *12. Both sides' briefing on this issue is less than comprehensive, but we determine that the citations to authority and substantive arguments in both Rodriguez's Appellee brief and R.M. Personnel's reply brief are fleshed out enough to adequately put this issue before the Court.

21

formal adversarial stage decided either by a mutually agreeable arbitrator or in a contested hearing before the Division, TEX.LAB.CODE ANN. §§ 410.104 & 410.151; (3) an administrative appeal to the Division's appellate body, TEX.LAB.CODE ANN. § 410.202; and (4) a modified de novo review by a district court. *See In re Tyler Asphalt & Gravel Co., Inc.*, 107 S.W.3d 832, 841 (Tex.App.—Houston [14th Dist.] 2003, orig. proceeding).

It is uncontested that the Division acted in a judicial capacity in issuing the order. *In re Louisiana-Pacific Corp.* shows that the Division acts in a judicial capacity when it renders a decision as to employer status, and that the Division's final resolution of the employer's status can bind the parties in later stages of litigation when the exclusive remedy defense is raised because the issues underpinning both the Division's workers' compensation order and exemption from trial liability are the same. *See In re Louisiana-Pac. Corp.*, 112 S.W.3d 185, 189–90 (Tex.App.—Beaumont 2003, orig. proceeding); *see also In re Luby's Cafeterias, Inc.*, 979 S.W.2d 813, 817 (Tex.App.—Houston [14th Dist.] 1998, orig. proceeding)(granting mandamus abating negligence suit until Workers' Compensation Commission ruled on whether injury was compensable because "subjecting the workers' compensation subscriber to a negligence trial and a potential judgment before the Commission decides whether the employee's injury is compensable will inject needless uncertainty and confusion into the issues surrounding both proceedings").

R.M. Personnel does not contest that the facts about employer status were fully and fairly litigated before the Division and that the issue of employer status was essential to the order in the contested hearing. Instead, R.M. Personnel asserts that it cannot be bound by the Division's order because it was not a party to the contested case—only its insurance carrier was a party to that administrative proceeding.

The Fourteenth Court of Appeals in *In re Luby's Cafeteria* was faced with a variation of

22

the argument R.M. Personnel raises in this case. In *In Re Luby's Cafeteria*, an employee alleged that she was sexually assaulted by another employee while on duty. 979 S.W.2d at 814–15. Her employer, Luby's, was a workers' compensation subscriber. *Id.* at 815. Luby's insurance carrier initially denied the employee's claim on the grounds that the sexual assault was not a compensable injury. *Id.* Later, after the employee sued Luby's, the insurance carrier reopened the employee's claim and the issue of compensability moved into a contested hearing before the Workers' Compensation Commission. *Id.* The employee and the insurance carrier were before the Commission; Luby's was not a party to the contested case. Administrative proceedings were ongoing at the time the employee's trial against Luby's was set to begin.

In a mandamus action, Luby's requested abatement of the upcoming trial pending the Commission's final decision. The Fourteenth Court conditionally granted mandamus relief, focusing its attention largely on the preclusive effect that the Commission's coverage decision would have on trial. *Id.* at 815–16. One of the arguments the employee advanced against abatement was that Luby's was not a party to the Commission's proceedings; thus, the findings would not bind Luby's. *Id.* at 817. The Fourteenth Court summarily rejected that argument, noting that it "ignores the fact that the compensation carrier is acting on Luby's behalf in those proceedings, which involve some of the same issues, facts and witnesses as the underlying trial." *Id.*

We are inclined to agree with the Fourteen Court's assessment of the relationship between the insurance carrier and the insured. True, we recognize that although a subscriber and a carrier are in privity of contract, at least in theory, their interests may not necessarily align in a Division proceeding; the carrier has an incentive to argue the subscriber is not an employer, which would absolve the carrier of the obligation to pay benefits, and the subscriber has an incentive to argue

23

that it is a covered employer, which essentially immunizes it from suit and forces the carrier to bear the costs of the employee's injury. However, Liberty Mutual and R.M. Personnel were in privity of contract, and per *In re Luby's Cafeteria*, we find that the interests of Liberty Mutual and R.M. Personnel are sufficiently aligned so as to allow collateral estoppel to apply vis-à-vis the issue of employer status. Indeed, R.M. Personnel and Liberty Mutual both had an aligned interest in the contested hearing: both wanted Perspectiva to be named Rodriguez's employer so that Perspectiva's carrier would be liable for paying Rodriguez benefits.

Furthermore, R.M. Personnel was not precluded from participating in the Division's proceedings if it believed it necessary to do so as a result of a conflict between its interests and those of its insurance carrier. An employer may intervene directly when the insurance carrier accepts the compensability of a claim. *See* TEX.LAB.CODE ANN. § 409.011(b)(4). But even where, as in this case, an insurance carrier *does* contest compensability, an employer still retains a cluster of rights before the Division, including (1) the right to be present at all administrative proceedings relating to an employee's claim and (2) the right to present relevant evidence relating to an employee's claim at any proceeding. *See* TEX.LAB.CODE ANN. § 409.011(b)(1)-(2). We find that these provisions provided an adequate opportunity for R.M. Personnel to litigate the issue of whether Rodriguez was an employee such that its insurance carrier was liable and R.M. Personnel could later avail itself of the exclusive remedy defense. *See SWEPI, L.P.*, 139 S.W.3d at 338 (collateral estoppel applies to administrative orders if party to be charged had adequate opportunity to litigate in the administrative forum). R.M. Personnel did not attempt to avail itself of these opportunities to present evidence regarding employer/employee status before the Division.

Finally, we believe this approach tracks not only with the letter of collateral estoppel, but with the Act's overall purpose, and with common sense. The Workers' Compensation Act

24

represents a tripartite balancing act among competing interests: "[t]he carrier agrees to compensate the employee for injuries sustained in the course of employment and the employee agrees to relinquish his common law rights against the employer." *In re Luby's Cafeteria*, 898 S.W.2d at 817. Allowing parties to relitigate the issue of employer status other than on direct appeal from the order itself as provided for in the Act would subvert the balance of competing interests struck by the Act and undermine the Division's jurisdiction over controversies regarding employer status by opening the door to collateral attacks and, by extension, more costly litigation. The order should be given preclusive effect.

R.M. Personnel argues that the Division clearly erred in finding that Perspectiva alone was Rodriguez's employer for purposes of the Act because it acted under the mistaken assumption that an employee can have only one employer. We withhold judgment on the merits of that question because we are not on direct review from a challenge to the Division's order; we are sitting on appeal from a jury verdict, and we believe the Division's order collaterally estops any further litigation on the issue of R.M. Personnel's status as an employer and, consequently, the availability of the exclusive remedy defense. Per the Division's order, R.M. Personnel is not an employer. The exclusive remedy defense is unavailable.

R.M. Personnel's Issue One is overruled.

### 3.
### *Merits of Negligence Verdict*
### *(R.M. Personnel's Issue Two)*

In R.M. Personnel's Issue Two, the company asserts that Rodriguez did not prove the elements of his negligence claim. Specifically, R.M. Personnel contends there is no legally or factually sufficient evidence that (1) it had a duty to ensure a safe workplace on Perspectiva's job site, and (2) R.M. Personnel caused Rodriguez's injuries. Rodriguez urges us to affirm the verdict

based on his contention that R.M. Personnel's opening brief addresses only the company's purported failure to rectify the work site theory, whereas at trial he raised both failure-to-rectify and failure-to-train theories to support his negligence cause of action. Since the failure-to-train theory was unchallenged in R.M. Personnel's opening brief, Rodriguez asks us to affirm the jury's verdict by procedural default.

We address Rodriguez's waiver argument first. In the negligence cause of action contained in the live pleading, Rodriguez alleged R.M. Personnel was negligent in five ways:

a. RMP failed to properly train Plaintiff;

b. RMP failed to maintain the work place in a safe condition;

c. RMP failed to inspect and correct a dangerous condition;

d. RMP failed to properly warn of the dangerous condition; and

e. RMP failed to supervise the work properly.

In his brief, Rodriguez points to excerpts from closing arguments that he contends show that the issue of failure to train were placed before the jury.[7] The broad-form jury charge did not

---

[7]

- [PLAINTIFF'S COUNSEL]: We started with Amber Vargas, Ms. Vargas with RM Personnel. And she testified that, of course, RM Personnel has a duty to make sure the worksite is safe before they send the workers, before they send Mr. Rodriguez off to a construction site, and, of course, they have a duty to remove those workers if the site is not safe or to not send them there at all. *And she also clearly acknowledged that they had a duty to train their workers on how to work safely.*
    But what do we know from her testimony? *Well, we know that she's claiming that the workers are trained and that Mr. Rodriguez would have been told this.* [Emphasis added].

- [PLAINTIFF'S COUNSEL]: Look at that application. See if he was ever asked, see if he failed to disclose anything. He was told several months earlier, 'Don't work at unprotected heights.' *Did he receive any training whatsoever on what an unprotected height is? Did he receive any type of instruction? Look at all the document. Listen to the evidence. Was there any training whatsoever about what an unprotected height is?* [Emphasis added].

- [PLAINTIFF'S COUNSEL]: Let's be clear. On September 1st, when they want to blame everything on Jorge Acosta, Mr. Acosta takes another worker of RM Personnel and goes up to the roof . . . Why did they do that? . . . Because he had never been trained. Because he had never been told, 'You can't go up there.'
    Don't you think –don't you think that a company should know how its workers should be utilized, what directions they've been given?

26

separate out the failure-to-inspect and failure-to-train theories of negligence, but instead defined negligence with respect to R.M. Personnel generally as the "failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." Question 1 authorizing recovery against R.M. Personnel stated: "Did the negligence, if any, of those named below proximately cause the occurrence in question?" The jury answered yes to R.M. Personnel Inc.

We agree with Rodriguez that R.M. Personnel's opening brief on appeal focuses entirely on the issue of worksite inspection and does not address any failure-to-train theory. "As a general proposition, an appellant must attack all independent bases or grounds that fully support a complained-of ruling or judgment." *Oliphant Fin. L.L.C. v. Hill*, 310 S.W.3d 76, 77 (Tex.App.—El Paso 2010, pet. denied). "If an appellant fails to do so, then we must affirm the ruling or judgment." *Id.* at 78. "This proposition is predicated upon the understanding that if an independent ground fully supports the complained-of ruling or judgment, but the appellant assigns no error to that independent ground, then we must accept the validity of that unchallenged independent ground; thus, any error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained-of ruling or judgment." *Id.*

Because R.M. Personnel did not attack the failure-to-train theory pleaded in the live petition in its opening brief, because that theory is one of several undergirding the jury's verdict, and because that theory could independently support the negligence cause of action in the jury's verdict, we will affirm the trial court's judgment as to negligence.

R.M. Personnel's Issue Two is overruled.

### *4.* 
### *Prejudgment Interest*

Finally, we turn to prejudgment interest. In R.M. Personnel's Issue Four, the company contends that the trial court erred by using December 4, 2007 as the prejudgment interest calculation interest date. We disagree. R.M. Personnel's carrier Liberty Mutual kicked off all litigation in this case by filing a subrogation suit against Perspectiva on December 4, 2007, that was later consolidated into Rodriguez's suit. Given that R.M. Personnel and Liberty Mutual were in privity, we believe December 4, 2007, was the appropriate date for the trial court to use in its judgment.

R.M. Personnel's Issue Four is overruled.

## C.

### ISSUES RAISED BY NEW HAMPSHIRE INSURANCE COMPANY

Appellant New Hampshire Insurance Company's five appellate issues all deal with its claims against Rodriguez's jury award for both reimbursement of worker's compensation benefits already paid out to Rodriguez and the offset of future benefit obligations it is slated to pay under the policy. "The law governing this [issue] is simple: the compensation carrier gets the first money a worker receives from a tortfeasor." *Tex. Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 35 (Tex. 2008). "[U]ntil a carrier is reimbursed in full, the employee or his representatives have no right to any of such funds." [Internal citation and quotation marks omitted]. *Id*. at 36. "There is nothing discretionary about this statute; a carrier's right to reimbursement is mandatory." *Id.* The amount to which New Hampshire Insurance is entitled is less clear. We address that question below.

*Application of Employer Negligence Off-Set*

At play in this case are two statutory provisions: TEX.LAB.CODE ANN. § 417.001, which establishes the carrier's subrogation rights; and TEX.LAB.CODE ANN. § 417.002, which deals with

carrier reimbursement.

Section 417.001 states, in relevant part (with the primary provision at issue italicized):

**§ 417.001. Third-Party Liability**

(a) An employee or legal beneficiary may seek damages from a third party who is or becomes liable to pay damages for an injury or death that is compensable under this subtitle and may also pursue a claim for workers' compensation benefits under this subtitle.

(b) If a benefit is claimed by an injured employee or a legal beneficiary of the employee, the insurance carrier is subrogated to the rights of the injured employee and may enforce the liability of the third party in the name of the injured employee or the legal beneficiary. *The insurance carrier's subrogation interest is limited to the amount of the total benefits paid or assumed by the carrier to the employee or the legal beneficiary, less the amount by which the court reduces the judgment based on the percentage of responsibility determined by the trier of fact under Section 33.003, Civil Practice and Remedies Code, attributable to the employer.*[8] If the recovery is for an amount greater than the amount of the insurance carrier's subrogation interest, the insurance carrier shall:

> (1) reimburse itself and pay the costs from the amount recovered; and

> (2) pay the remainder of the amount recovered to the injured employee or the legal beneficiary. [Emphasis added].

Section 417.002 reads as follows:

**§ 417.002. Recovery in Third-Party Action**

(a) The net amount recovered by a claimant in a third-party action shall be used to reimburse the insurance carrier for benefits, including medical benefits, that have been paid for the compensable injury.

(b) Any amount recovered that exceeds the amount of the reimbursement required under Subsection (a) shall be treated as an advance against future benefits, including medical benefits, that the claimant is entitled to receive under this subtitle.

(c) If the advance under Subsection (b) is adequate to cover all future benefits, the

---

[8] TEX.CIV.PRAC.&REM.CODE ANN. § 33.003 establishes that a jury shall determine proportionate responsibility in negligence cases by assigning a whole number percentage or responsibility to each claimant, each defendant, each settling person, and each responsible third party who has been designated under Section 33.004.

insurance carrier is not required to resume the payment of benefits. If the advance is insufficient, the insurance carrier shall resume the payment of benefits when the advance is exhausted.

The text italicized above in Section 417.001(b) was added to the statute in 2003. *See Erivas v. State Farm Mut. Auto. Ins. Co.*, 141 S.W.3d 671, 674 n.1 (Tex.App.—El Paso 2004, no pet.); see *also* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.09, 2003 TEX.GEN.LAWS 847, 858–59. Courts interpreting pre-2003 versions of the workers' compensation subrogation/reimbursement scheme have said "[i]t is well-settled Texas law that a workers' compensation carrier is entitled to recover one hundred percent of compensation paid to an insured employee as a result of the employee's recovery of damages from a third party in a negligence action." *Texas Workers' Comp. Ins. Fund v. Travis*, 912 S.W.2d 895, 897 (Tex.App.—Fort Worth 1995, no writ); *accord Argonaut Ins. Co. v. Baker*, 87 S.W.3d 526, 530 (Tex. 2002). The question here, apparently one of first impression, is whether the 2003 statutory amendment cabining the carriers' subrogation interest in light of the subscribing employer's negligence changes that "well-settled" law on the carrier's reimbursement rights as well.

Rodriguez contends that it does. His argument, boiled down to its basics, is this: Rodriguez asserts that Section 417.001(b)'s subrogation reduction provision applies to this third-party claim suit and cabins New Hampshire Insurance's ability to claim reimbursement based on the fact that the insured employer—Perspectiva—had its negligence assessed by a jury as a designated responsible third party. As such, New Hampshire Insurance's subrogation interest—and by extension its ability to receive reimbursement—is reduced by the dollar amount the jury attributed to Perspectiva's negligence. Since the jury found that Perspectiva was responsible for 61 percent of the $20.5 million in damages ($12,505,000), we must offset New Hampshire Insurance's subrogation/reimbursement interest by $12,505,000. And since New Hampshire Insurance has yet

to pay out $12,505,000 in benefits to Rodriguez, the carrier must continue to pay benefits until the balance of its subrogation interest zeroes out, at which point reimbursement from the award and treating the award as an advance against future benefits are permitted.

New Hampshire Insurance advances five lines of attack against Rodriguez's position. Two arguments assert that the statutory reduction provision in Section 417.001(b) does not apply to this case at all. Three alternative arguments deal with how to calculate a subrogation interest reduction in the event that the statute does apply. We will first address the issue of whether Section 417.001(b)'s statutory reduction provision applies in this case. We find that it does.

**1.**
**Judgment Reduction**
**(New Hampshire Insurance Issues One and Five)**

In New Hampshire Insurance's Issues One and Five, the carrier argues that the statute does not apply because the trial court never "reduced" the judgment based on the negligence of Perspectiva, the insured party. We disagree.

New Hampshire Insurance repeatedly asserts that despite the jury's quantification of liability against subscribing employer Perspectiva and the trial court's entry of judgment consistent with that verdict, there was no "reduction" of a judgment in this case because under TEX.CIV.PRAC. & REM.CODE ANN. § 33.012(a)—which provides for reductions in a judgment amount based on the contributory negligence of a "claimant" itself—the only situation in which a trial court could reduce a verdict based on "claimant" negligence is when the employer itself is the "claimant," i.e. when a self-insured employer brings a subrogation suit and is found to be contributorily negligent.

But the underlying premise of this argument is incorrect. TEX.LAB.CODE ANN. § 417.001(b) setting the parameters of the carrier's subrogation interest is not framed in relation to the claimant/plaintiff-focused *contributory* negligence provision at TEX.CIV.PRAC.&REM.CODE

31

ANN. § 33.012(a). Rather, Section 417.001(b) defines the carrier's subrogation interest by redirecting toward TEX.CIV.PRAC.&REM.CODE ANN. § 33.003, which deals with the jury's assessment of *proportionate* responsibility of not only claimant/plaintiffs, but also among defendants, settling persons, and responsible third parties[9] designated under Section 33.004. *See* TEX.LAB.CODE ANN. § 417.001(b); TEX.CIV.PRAC.&REM.CODE ANN. § 33.003(a)(1)-(4). Moreover, Section 417.001(b) provides that the subrogation interest equals the amount benefits paid or assumed "less the amount by which the court reduces the judgment *based on the percentage of responsibility determined by the trier of fact under Section 33.003, Civil Practice and Remedies Code, attributable to the employer*." [Emphasis added]. TEX.LAB.CODE ANN. § 417.001(b). Contrary to New Hampshire Insurance's argument, this reduction provision is not limited solely to those situations in which the employer is a claimant; it applies whenever a jury passes on the question of the employer's liability regardless of in which role the employer is cast in a lawsuit, be it claimant, defendant, settling party, or as in this case, a responsible third party designated under Section 33.004.

The plain meaning of this provision becomes even clearer when viewed through the prism of statutory changes leading up to the adoption of the Section 417.001(a) subrogation limitation. Prior to 2003, litigants could not designate a subscribing employer as a responsible third party, and since a subscribing employer was also immune from suit at large, the issue of whether and to what extent the subscribing employer was negligent could never make its way before a jury. That changed in 2003, when the Legislature adopted a slew of changes to civil litigation practice, including two that are relevant to this case. *See generally* Act of June 2, 2003, 78th Leg., R.S., ch.

---

[9] "Responsible third party" in this statutory provision means an entity not joined as a party to the litigation that nevertheless may bear responsibility for an injury. *In re CVR Energy, Inc.*, 500 S.W.3d 67, 78 (Tex.App.—Houston [1st Dist.] 2016, orig. proceeding)(opn. on reh'g).

32

204, § 4.04, 2003 TEX.GEN.LAWS 847, 855-56. First, the Legislature eliminated a prohibition in Section 33.003 of the Texas Civil Practice and Remedies Code against naming a subscribing employer as a responsible third party, meaning that even though the subscribing employer remained immune from suit, the employer's negligence could for the first time be placed at issue before a jury and thereby (1) proportionally reduce an employee's recovery and (2) allow other parties' negligence to be viewed in context of all potential negligence at large. Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 4.05, 4.11, 2003 TEX.GEN.LAWS 847, 857, 859; *see also In re Unitec Elevator Services Co.*, 178 S.W.3d 53, 58 n. 5 (Tex.App.—Houston [1st Dist.] 2005, orig. proceeding)(noting effect of amendment). Second, the Legislature amended Section 417.001(b) to include the subrogation limitation cross-referencing the newly-updated proportionate responsibility provisions at TEX.CIV.PRAC.&REM.CODE ANN. § 33.012(a), framing the subrogation interest reduction in terms of the employer's proportionate responsibility.

Rodriguez directs us to several commentaries in which authors note that the addition of otherwise immunized subscribing employers to the list of potential responsible third parties and the concomitant limitation of a carrier's subrogation interest with respect to the proportionate responsibility statute represented a trade-off between competing interests. *See, e.g.,* David W. Holman, *Responsible Third Parties*, 46 S.TEX.L.REV. 869, 885 (2005)(opining that in exchange for allowing immunized employers to be designated as responsible third parties "legislators provided that the worker's compensation carrier's subrogated lien will be reduced in accordance with the percentage of fault attributed by the trier of fact to the employer"); Tom Cowart, *A Plaintiff's Lawyer's Take on House Bill 4*, 24 THE ADVOC. (TEX.) 39, 41 (Fall 2003)(reading the statutory changes as providing that "if the judgment is reduced because of the employer's fault, the workers' compensation insurance carrier is not allowed to recoup those sums from the money

otherwise recovered by the worker"). We agree with Rodriguez's interpretation of the statute, and with the contention that this represents the Legislature's attempt to rebalance competing interests.

We find that Section 417.001(b)'s subrogation off-set applies when a jury passes on the question of the employer's liability in a given case, even if the employer appears in the jury's verdict simply as a responsible third party. The employer does not need to bring a first-party suit in order for Section 417.001(b) limitation to apply to its carrier. Here, the question of Perspectiva's proportional negligence was submitted to the jury because Perspectiva was designated as a responsible third party. Section 417.001(b) yokes New Hampshire Insurance's recovery to that jury finding, even though Perspectiva itself was likely immune from suit and even though New Hampshire Insurance was neither a main plaintiff nor a main defendant, but simply an intervenor. There was no error in this; at least as to this point, the statue performed precisely as the Legislature intended it to function. New Hampshire Insurance's Issues One and Five are overruled.

**2.**
**Applicability of Subrogation Limitation in Third-Party Suits**
**(New Hampshire Insurance Issue Two)**

In New Hampshire Insurance's Issue Two, the carrier maintains that the statutory reduction provision is inapplicable here because Section 417.001(b) applies only when a carrier or employer brings suit in the employee's name as subrogee. In this case, neither New Hampshire Insurance nor Perspectiva prosecuted the case as Rodriguez's subrogees; Rodriguez prosecuted the case himself, and New Hampshire Insurance became a party only through intervention. As such, Section 417.001(b)'s offset provisions are not triggered, the jury's findings related to Perspectiva's negligence are wholly irrelevant, and New Hampshire Insurance can claim full reimbursement under Section 417.002. Amicus curiae Texas Mutual Insurance Company advances the same point in its brief, arguing that the Section 417.001(b) subrogation reduction provision applies only in

34

employer/carrier-initiated litigation. We again disagree.

Section 417.001(b) does not state that it is triggered only by a carrier initiating litigation. Rather, the plain terms of the statute state that "*[i]f a benefit is claimed by an injured employee . . . the insurance carrier is subrogated to the rights of the injured employee and *may* enforce the liability of the third party in the name of the injured employee . . . .*" [Emphasis added]. TEX.LAB.CODE ANN. § 417.001(b). We read this to mean that (1) an employee's claim of workers' compensation benefits is the triggering event which creates a limited subrogation interest held by the carrier paying the benefits and (2) either the carrier *or* the employee can enforce liability against a third party. *Accord Russell v. Metro. Transit Auth. of Harris County*, 343 S.W.3d 825, 830 (Tex.App.—Houston [14th Dist.] 2011, no pet.). This provision fits hand-in-glove with Section 417.001(a), which allows an employee to claim workers' compensation benefits from a subscribing employer, file a lawsuit against a third party, or both. TEX.LAB.CODE ANN. § 417.001(a). Read together, these two sections establish that an employee can seek a remedy from either a subscribing employer's insurance carrier or directly from another tortfeasor, but if an employee chooses to claim workers' compensation benefits from a carrier, the carrier has a subrogation interest in litigation against any third-party tortfeasor *regardless of* whether the litigation is initiated by the employee or by the carrier itself as subrogee.[10] *See Wausau*

---

[10] As Texas Mutual points out in its amicus curiae brief, it was not always the case that a worker could both claim workers' compensation benefits *and* sue a third-party tortfeasor. Texas' original workers' compensation statute passed in 1913 allowed workers to pursue statutory benefits while also suing third-party tortfeasors at common law. *See generally* Act of April 16, 1913, 33rd Leg., R.S., ch. 179, 1913 TEX.GEN.LAWS 429. That law was criticized for essentially permitting a worker to pursue double recovery for his injuries while depriving the insurance carrier of reimbursement for benefits made under the policy, which could serve to drive the price of insurance up. *See Consol. Underwriters v. Kirby Lumber Co.*, 267 S.W. 703, 706 (Tex. [Comm'n Op.] 1924)(discussing structure of 1913 Act).

The 1917 version of the statute created an election-of-remedies scheme in which the worker had to choose between receiving benefits or suing tortfeasors. Electing to receive benefits barred the worker from suing any other tortfeasor, even a non-subscribing tortfeasor; electing to sue a tortfeasor barred the worker from receiving workers' compensation benefits. *See* Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, 1917 TEX.GEN.LAWS 269. However, if the worker elected to receive compensation benefits under the 1917 statute, the carrier was subrogated to the worker's causes of action against third parties and could sue in the worker's name. Any proceeds in excess of what the insurance company

*Underwriters Ins. Co. v. Wedel*, 557 S.W.3d 554, 556 (Tex. 2018).

The second sentence of Section 417.001(b) defines the scope of the carrier's subrogation interest: "The insurance carrier's subrogation interest *is limited* to the amount of the total benefits paid or assumed by the carrier to the employee . . . less the amount by which the court reduces the judgment based on the percentage of responsibility determined by the trier of fact under Section 33.003, Civil Practice and Remedies Code, attributable to the employer." TEX.LAB.CODE ANN. § 417.001(b). Finally, the third sentence sets out what must happen in the event that a recovery exceeds the carrier's subrogation interest: the carrier shall "reimburse itself and pay the costs from the amount recovered" and "pay the remainder of the amount recovered to the injured employee or the legal beneficiary." *Id*. We see nothing in the plain language of the statute dictating that this provision applies only in the event of an employer- or carrier-initiated lawsuit. *See Russell*, 343 S.W.3d at 830 (stating that when a covered employee pursues a third-party lawsuit the carrier is

---

were paid to the worker. *See* Act of Mar. 28, 1917, 35th Leg., R.S., ch. 103, § 6a, 1917 TEX.GEN.LAWS 269, 285; *see also Granite State Ins. Co. v. Firebaugh*, 558 S.W.2d 550, 552 (Tex.App.—Eastland 1977, writ ref'd n.r.e.). Under this statutory scheme, the concept of the "first money" principle emerged where carriers with subrogation rights could receive money that had been wrongfully disbursed by a third party to the worker for reimbursement. *See, e.g., Capitol Aggregates, Inc. v. Great Am. Ins. Co.*, 408 S.W.2d. 922, 922-24 (Tex. 1966).

The statute was amended in 1973 to allow a worker to pursue both benefits and third-party tortfeasor suits. *See* Act of May 10, 1973, 63rd Leg., R.S., ch. 88, § 10, sec. 6a, 1973 TEX.GEN.LAWS 187, 193; *see also Granite State Ins. Co.*, 558 S.W.2d at 552 (discussing legislative history behind 1973 amendment). The amended statute also contained extensive new provisions dealing with attorney compensation calculations in the event the injured worker chose to pursue a third-party tortfeasor lawsuit in his own name, with set percentages based on scenarios including when the employee had an attorney and the carrier did not have an attorney representing its interests; when both the employee and the carrier had attorneys representing their interests; when an attorney agreed to represent the interests of both the employee and the carrier; and so on. *See id*. The 1973 Amendments also for the first time allowed the carrier to reimburse itself for benefits and medical expenses paid from the net proceeds of the worker-initiated third-party action, and to treat any excess recovery by the worker as an advance against future benefits. Act of May 10, 1973, 63rd Leg., R.S., ch. 88, § 10, sec. 6a, 1973 TEX.GEN.LAWS 187, 193-94.

In 1989, during a legislative overhaul, this unitary provision was split into different subsections and reordered under a heading entitled "Third Party Liability." Act of Dec. 13, 1989, 71st Leg., 2d C.S., ch. 1, § 4.05, 1989 TEX.GEN.LAWS 1, 33. The provision dealing with third party liability was altered again and recodified in the Texas Labor Code in 1993, taking the overall structure and form it appears in today, with the provision dealing with subrogation appeared in Section 417.001(b) and the provision dealing with reimbursement appearing in Section 417.002.

The limitation placed on the subrogation interest in Section 417.001(b) was added to the statute in 2003.

36

"subrogated" to the rights of the employee up to the amount specified in Section 417.001(b));
*Liberty Ins. Corp. v. SM Energy*, CIV.A. H-12-3092, 2012 WL 6100303, at \*7–\*8 (S.D. Tex. Dec.
7, 2012)(carrier may enforce its subrogation right by either bringing subrogation suit or by
reimbursing itself from third-party lawsuit recovery; the rights in Sections 417.001(b) and Section
417.002 are not separate but deal with the same right).

Sections 417.001(b) and 417.002 do not operate in vacuums. As we previously recognized,
the two provisions are linked, and we must interpret them in light of each other. *See Wausau*
*Underwriters Ins. Co. v. Wedel*, 518 S.W.3d 615, 621 (Tex.App.—El Paso 2017), *aff'd*, 557
S.W.3d 554 (Tex. 2018). Indeed, we have found that "an insurance carrier's right of subrogation
encompasses the right of reimbursement" such that when a carrier waives the right to subrogate, it
also waives the right to reimbursement or future credits from a third-party award in a worker-
initiated lawsuit. *Wausau*, 518 S.W.3d at 622. Continuing along the line of logic we established
in *Wausau*, we find that the subrogation limitation in Section 417.001(b) applies to the
reimbursement provision of Section 417.002. New Hampshire Insurance's reimbursement right
here is limited by Section 417.001(b). New Hampshire Insurance's Issue Two is overruled.

*Entitlement to Off-Set and Amount*

Having determined that Section 417.001(b) limiting the subrogation interest also limits the
amount New Hampshire Insurance may be reimbursed, we next decide the size of New Hampshire
Insurance's subrogation/reimbursement interest. First, as background, recall that the jury found
Rodriguez suffered $20,500,000 in damages, and that it apportioned 61 percent of the blame to
responsible third party Perspectiva, 17 percent to R.M. Personnel, 11 percent to SWI, and 11
percent to Rodriguez himself. The final judgment entered for $6,166,222.72 represented the 11
percent of the overall damages amount attributable to SWI ($2,255,000) and the 17 percent of the

37

overall damages amount attributable to R.M. Personnel ($3,485,000), plus applicable prejudgment interest. The 61 percent amount attributable to Perspectiva ($12,505,000) and the 11 percent amount attributable to Rodriguez himself ($2,255,000) were not included in the final judgment. The respective percentage and dollar amounts attributable to each entity at fault is represented visually in Table 1.1 below.

| Entity at Fault | Percent at Fault | Dollar Amount (Out of $20.5 Million, Not Including Interest) |
|---|---|---|
| Perspectiva | 61% | $12,505,000 |
| R.M. Personnel | 17% | $3,485,000 |
| SWI | 11% | $2,255,000 |
| Rodriguez | 11% | $2,255,000 |

*Table 1.1 (Jury Verdict)*

Relevant to this portion of the appeal, the judgment ordered New Hampshire Insurance to continue paying workers' compensation benefits in the amount of $11,542,588.75, plus prejudgment interest (representing the $12,505,000 minus benefits already paid by New Hampshire Insurance). Once New Hampshire Insurance paid that amount, the judgment permitted New Hampshire Insurance to apply a credit of $4,066,648.67 (the total amount of Rodriguez's judgment) toward future benefits, i.e. New Hampshire Insurance could stop paying workers' compensation benefits until a credit in the amount of $4,066,648.67 was exhausted. After the credit was exhausted, New Hampshire Insurance would resume payment of workers' compensation benefits.

*3.*
***Delay of Statutory Advance Against Future Benefits***

We first address whether the subrogation/reimbursement reduction is calculated pro rata or by dollar amount. In New Hampshire Insurance's Issue Four, the carrier asserts that if the reduction provision applies, the statute requires the lien to be reduced only by the percentage attributable to Perspectiva's negligence. In other words, because Perspectiva was found 61 percent negligent, New Hampshire Insurance's potential recovery would be reduced 61 percent and it could only recover a 39 percent pro rata share of its expenses. Rodriguez counters that the statute requires a dollar amount calculation, meaning that New Hampshire Insurance's first money lien is reduced by $12,505,000. The distinction is critical because if Rodriguez is right, New Hampshire Insurance's subrogation interest is reduced to an amount below that which Rodriguez actually recovered.

> The relevant language of Section 417.001(b) states:
>
> The insurance carrier's subrogation interest is limited to the amount of the total benefits paid or assumed by the carrier to the employee or the legal beneficiary, *less the amount* by which the court reduces the judgment *based on the percentage of responsibility* determined by the trier of fact under Section 33.003, Civil Practice and Remedies Code, attributable to the employer. [Emphasis added].

TEX. LABOR CODE ANN. § 417.001(b).

We are inclined to agree with Rodriguez. The statute refers to a reduction in an "amount" based on a "percentage." Further, the word "amount" is used twice in that sentence; in the first instance, "amount" clearly refers to a dollar amount of "total benefits paid." We generally interpret words the same way in a given text, meaning that the most natural reading of "the amount by which the court reduces the judgment" is a dollar amount as well. Had the Legislature intended to limit the carrier's subrogation interest proportionally, it could have written the statute differently. But as written, we find that Rodriguez's interpretation carries the day. Section 417.001(b)'s reduction

39

provision applies in dollars and not as a percentage.

New Hampshire Insurance's Issue Four is overruled.

Finally, we address New Hampshire Insurance's Issue Three. New Hampshire Insurance contends that even if the reduction applies in dollars, and even if the amount of damages attributable to subscribing employer Perpsectiva far outweighed the ultimate award Rodriguez actually received, the statute does not require the carrier to pay out benefits equal to the dollar amount attributable to Perspectiva before being allowed to treat the award as an advance against future benefit payments. On this point, we agree with New Hampshire Insurance.

Rodriguez is correct that New Hampshire Insurance is ineligible for reimbursement because the dollar amount of damages attributable to Perspectiva exceeds the total amount awarded in fact. However, we disagree that the statute requires New Hampshire Insurance to pay an amount of benefits equal to the dollar amount of damages attributable to Perspectiva before the carrier can treat the $4,066,649.97 award as an advance against future benefits. The reimbursement/subrogation provisions do not create liability in the carrier when the amount of money attributable to the subscribing employer's negligence exceeds the amount the worker receives in a third-party action, resulting in a negative reimbursement interest. Rather, the plain language of the statute simply provides that "[a]ny amount recovered that *exceeds that amount of reimbursement required under Section (a)* shall be treated as an advance against future benefits . . . . " [Empahsis added]. Here, there is no reimbursement required. Thus, the $4,066,649.97 award recovered should be treated as an advance against future payments. The trial court erred by holding otherwise.

New Hampshire Insurance's Issue Three is sustained.

## CONCLUSION

40

We issue the following judgment:

- We modify the judgment to reflect a prejudgment interest start date of April 22, 2008, with respect to SWI;

- We affirm the judgment with respect to R.M. Personnel; and

- We reverse the portion of the judgment with respect to New Hampshire Insurance, and we render judgment (1) that New Hampshire Insurance is not entitled to reimbursement from the jury award, and (2) ordering New Hampshire Insurance Company to apply a credit in the amount of $4,066.648.67, as an advance against future benefits, and to resume payment of workers' compensation benefits that would otherwise be payable once this credit has been applied.

January 11, 2019                                  YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J. (Not Participating)

41